1  Marc A. Shapp, Esq. (CA Bar No. 266805)
   Justin R. Panitchpakdi, Esq. (CA Bar No. 301434)
2  Hunsucker Goodstein PC
   3717 Mt. Diablo Blvd., Ste. 200
3  Lafayette, CA, 94549
   (925)284-0840
4  mshapp@hgnlaw.com
   jpanitchpakdi@hgnlaw.com
5
   Michael D. Goodstein, Esq. (DC Bar No. 469156)
6  Anne E. Lynch (DC Bar No. 976226)
   Hunsucker Goodstein PC
7  5335 Wisconsin Avenue NW, Ste. 360
   Washington, DC 20015
8  (202)895-5380
   mgoodstein@hgnlaw.com
9  alynch@hgnlaw.com

10 *Attorneys for Blue Lake Rancheria Tribe*

11                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
12                SAN FRANCISCO DIVISION

13 UNITED STATES OF AMERICA and          Case No.  3:16-cv-00961
   NORTH COAST UNIFIED AIR
14 QUALITY MANAGEMENT DISTRICT,          **DECLARATION OF JUSTIN
                                         PANITCHPAKDI IN SUPPORT OF
15                                       PLAINTIFF-INTERVENOR BLUE
                                         LAKE RANCHERIA TRIBE'S
16              Plaintiffs,              NOTICE OF MOTION, MOTION TO
                                         INTERVENE, AND MEMORANDUM
17         v.                            OF POINTS AND AUTHORITIES IN
                                         SUPPORT OF MOTION TO
18                                       INTERVENE**
   BLUE LAKE POWER, LLC,
19                                       Date: September 7, 2016
              Defendant.                 Time: 10:00am
20                                       Place: Courtroom 11
                                               450 Golden Gate Avenue,
21                                             San Francisco, CA
                                         Judge: Hon. James Donato
22

23

24

25

26

27

28
───────────────────────────────────────────────
DECLARATION OF JUSTIN R. PANITCHPAKDI IN SUPPORT OF PLAINTIFF-INTERVENOR BLUE LAKE
RANCHERIA TRIBE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
INTERVENE
CASE NO. 3:16-CV-00961

## DECLARATION OF JUSTIN PANITCHPAKDI

I, Justin Panitchpakdi declare and state as follows:

1.      I am an attorney for Plaintiff-Intervenor, the Blue Lake Rancheria Tribe (the "Tribe") and have personal knowledge of each fact stated in this declaration.

2.      A true and correct copy of the Tribe's Proposed Complaint In Intervention is attached to this declaration as Exhibit A.

3.      On April 4, 2016, The Tribe submitted comments on the Proposed Blue Lake Power Consent Decree to the Environmental and Natural Resources Division of the United Stated Department of Justice.  A true and correct copy of the Tribe's comments is attached to this declaration as Exhibit B.

4.      On April 4, 2016, Cooper M. DeMarse and David J. Rapport, associated counsel for the Tribe, submitted comments on the Proposed Blue Lake Power Consent Decree to the Environmental and Natural Resources Division of the United Stated Department of Justice. A true and correct copy of the comments is attached to this declaration as Exhibit C.

5.      On April 4, 2016, The Bureau of Indian Affairs ("BIA"), Pacific Regional Office submitted comments on the Proposed Blue Lake Power Consent Decree to the Environmental and Natural Resources Division of the United Stated Department of Justice. A true and correct copy of the BIA's comments is attached to this declaration as Exhibit D.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of August, 2016 in Lafayette, California.


                                             /s/ Justin R. Panitchpakdi
                                             JUSTIN R. PANITCHPAKDI

DECLARATION OF JUSTIN R. PANITCHPAKDI IN SUPPORT OF  PLAINTIFF-INTERVENOR BLUE LAKE
RANCHERIA TRIBE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
INTERVENE
CASE NO. 3:16-CV-00961

# EXHIBIT A

Marc A. Shapp, Esq.
CA Bar No. 266805
Justin R. Panitchpakdi, Esq.
CA Bar No. 301434
Hunsucker Goodstein PC
3717 Mt. Diablo Blvd., Ste. 200
Lafayette, CA, 94549
(925)284-0840
mshapp@hgnlaw.com
jpanitchpakdi@hgnlaw.com

Michael D. Goodstein, Esq.
DC Bar No. 469156
Anne E. Lynch
DC Bar No. 976226
Hunsucker Goodstein PC
5335 Wisconsin Avenue NW, Ste. 360
Washington, DC 20015
(202)895-5380
mgoodstein@hgnlaw.com
alynch@hgnlaw.com

*Attorneys for Blue Lake Rancheria Tribe*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and NORTH COAST UNIFIED AIR QUALITY MANAGEMENT DISTRICT,<br><br>Plaintiffs,<br><br>BLUE LAKE RANCHERIA TRIBE<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>BLUE LAKE POWER, LLC,<br><br>Defendant. | Case No.  3:16-cv-00961<br><br>**BLUE LAKE RANCHERIA TRIBE'S PROPOSED COMPLAINT IN INTERVENTION** |

1

## COMPLAINT

Intervenor Plaintiff, the Blue Lake Rancheria Tribe (the "Tribe") by and through its undersigned attorneys, allege as follows:

### NATURE OF ACTION

1.      This is a civil action brought by the Tribe under Section 304 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7604, and California common law including public nuisance, private nuisance, negligence, and trespass.

2.      The Tribe alleges that Defendant Blue Lake Power, LLC ("Defendant") violated the Act, California state law, and the federally-approved North Coast Unified Air Quality Management District (the "District") regulations incorporated into the California State Implementation Plan ("SIP"), at a biomass-fired electric generating plant in Blue Lake, California ("the Facility"), and that excess emissions from the Facility have caused a private nuisance, public nuisance, and trespass under Cal. Civ. Code § 3479, *et seq.* and California common law.

3.      The Tribe seeks civil penalties and injunctive relief requiring Defendant to comply with federal and state clean air laws and to mitigate excess emissions that have resulted from Defendant's non-compliance, damages for harms caused to the Tribe and its members, and a permanent injunction to prevent further harm from Defendant's excess emissions.

### JURISDICTION

4.      This Court has jurisdiction over the subject matter of this action and the parties pursuant to Section 304 of the Act, 42 U.S.C. §§ 7604, and 28 U.S.C. §§ 1331, 1355, 1362, and 1367.

### VENUE AND AUTHORITY

5.      Venue is proper in this judicial district pursuant to Section 304(c) of the Act, 42 U.S.C. § 7604(c), and 28 U.S.C. §§ 1391 and 1395, because the Facility is located, and the alleged violations occurred, and are occurring, in this judicial district.

6.      Intradistrict assignment is proper in the San Francisco Division pursuant to Civil L.R. 3-2, because a substantial part of the events and omissions giving rise to this Complaint occurred in Humboldt County.

## PARTIES

7.      Plaintiff Blue Lake Rancheria Tribe ("Tribe") is a federally recognized  Indian Tribe organized under a Constitution approved in accordance with the Indian Reorganization Act, 25 U.S.C. §476. The Tribe exercises jurisdiction over the Blue Lake Rancheria ("Reservation") located near the City of Blue Lake in Humboldt County, California. The United States of America owns land on the Tribe's Reservation in trust for the Tribe.

8.      Defendant is a California corporation that owned and currently operates the Facility, where the violations occurred and may occur. Defendant owned the Facility from at least January 17, 2008, until on or about September 24, 2010, when it entered into a sale-leaseback agreement for the sale of the Facility. Defendant has operated the Facility since at least January 17, 2008 and is the current operator of the Facility.

9.      Defendant ceased operations at the Facility in May 2015, but plans to restart the Facility. If and when Defendant re-commences operations at the Facility, violations of the Act and California law would occur.

10.      Defendant is a "person" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e), and District PSD Rule 130(p3).

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Air Act

11.      The Act was enacted to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

12.      Section 304 of the Act allows the Tribe to intervene as of right in order to enforce compliance with the Act. *United States v. Pac. Gas & Elec.*, 776 F. Supp. 2d 1007, 1017 (N.D. Cal. 2011). This right of intervention "replaces a citizen's right to bring an action in cases already pending," *United States v. U. S. Steel Corp.*, 87 F.R.D. 709, 710 (W.D. Pa. 1980), and is

3

1    intended "to both goad the responsible agencies to more vigorous enforcement of the anti-

2    pollution standards and, if the agencies remain[] inert, to provide an alternate enforcement

3    mechanism." *Baughman v. Bradford Coal Co.*, 592 F.2d 215, 218 (3d Cir. 1979) (*citing* S.Rep.

4    No. 1196, 91st Cong., 2d Sess. 2, 35-36 (1970); Comments of Senator Muskie and Senator

5    Boggs, 116 Cong.Rec. (1970) at pp. 32902, 32918)).

6                              *National Ambient Air Quality Standards*

7        13.    Section 109(a) of the Act, 42 U.S.C. § 7409(a), requires the Administrator of the

8    EPA to publish national ambient air quality standards ("NAAQS") for those air pollutants

9    ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of

10   the Act, 42 U.S.C. § 7408.

11       14.    Pursuant to Section 109 of the Act, 42 U.S.C. § 7409, EPA promulgated the

12   NAAQS at 40 C.F.R. Part 50.

13       15.    The NAAQS establish primary air quality standards to protect public health and

14   secondary standards to protect the public welfare from any known or anticipated adverse effects

15   associated with the presence of the air pollutant in the ambient air. 42 U.S.C. § 7409(b); 40

16   C.F.R. § 50.2(b).

17       16.    Pursuant to Section 107(d)(1)(A) of the Act, 42 U.S.C. § 7407(d)(1)(A), each

18   state is required to designate those areas, or districts, within its boundaries where the air quality

19   attains the NAAQS, fails to attain the NAAQS, or cannot be classified due to insufficient data

20   (unclassifiable). Areas that meet the NAAQS for a particular pollutant are designated

21   "attainment" areas for that pollutant, while areas that do not meet the NAAQS for a particular

22   pollutant are designated "non-attainment" areas.

23       17.    Pursuant to Sections 108 and 109 of the Act, 42 U.S.C. §§ 7408 and 7409, EPA

24   has identified carbon monoxide ("CO"), oxides of nitrogen ("$NO_x$") as measured by nitrogen

25   dioxide ("$NO_2$"), and particulate matter with a diameter of 10 micrometers or less ("$PM_{10}$") as

26   criteria pollutants and has promulgated NAAQS for these pollutants. 40 C.F.R. §§ 50.6, 50.8,

27   and 50.11.

28

4

18.     The Facility is located in Blue Lake, Humboldt County, California. Blue Lake is located within the North Coast Air Basin and is under the jurisdiction of the North Coast Air Quality Management District.

19.     At all times relevant to this Complaint, the North Coast Air Basin has been designated as attainment or unclassified for CO, $NO_2$, and $PM_{10}$. 40 C.F.R. § 81.305.

### *Prevention of Significant Deterioration Program*

20.     Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision-making process. 42 U.S.C. § 7470. These provisions are referred to herein as the "PSD program."

21.     As part of the PSD program, Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits "construction" of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165 and the facility employs the "Best Available Control Technology" ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility.

22.     Section 169(2)(c) of the Act, 42 U.S.C. § 7479(2)(c), defines "construction" as including "modification" (as defined in Section 111(a) of the Act, 42 U.S.C. §7411(a)). "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

23.     Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates sources with potential to emit 250 tons per year or more of any criteria air pollutant to be "major emitting facilities."

24.     Section 169(2)(A) of the Act, 42 U.S.C. § 7479(2)(A), defines "commenced as applied to construction of a major emitting facility" to mean that the owner or operator has obtained all necessary preconstruction approvals or permits required and either has "Begun or caused to begin, a continuous program of physical on-site construction of the facility" or "entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction at the facility to be completed within a reasonable time."

25.     Section 169(3) of the Act, 42 U.S.C. § 7479(3), defines BACT, in pertinent part, as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility . . . . In no event shall application of 'best available control technology' result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 . . . of this title."

26.     Pursuant to Section 110(j) of the Act, 42 U.S.C. § 7410(j), governing permits issued under Title I of the Act, "the owner or operator of each new or modified stationary source which is required to obtain such a permit must show . . . that the technological system of continuous emission reduction which is to be used will enable such source to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter." Section 165(a)(3) of the Act, 42 U.S.C. § 7475(a)(3), allows issuance of a PSD permit only if "the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility" will not compromise compliance with applicable air quality standards.

27.     Pursuant to Section 110 of the Act, 42 U.S.C. § 7410, each State must adopt and submit to EPA for approval a State Implementation Plan ("SIP") that includes, among other things, regulations to prevent the significant deterioration of air quality under Sections 161-165

6

of the Act, 42 U.S.C. §§ 7471-7475. Section 161 of the Act, 42 U.S.C. § 7471, requires that each applicable SIP contain a PSD program.

28.     A state may comply with Section 161 of the Act, 42 U.S.C. § 7471, by having its own PSD regulations approved by EPA as part of its SIP, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166. If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, then the EPA federal PSD regulations set forth at 40 C.F.R. § 52.166 shall be incorporated by reference into the SIP. 40 C.F.R. § 52.166 (a).

29.     Pursuant to Section 302(q) of the Act, 42 U.S.C. § 7602(q), an applicable implementation plan is the implementation plan, or most recent revision thereof, which has been approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410, and which implements the relevant requirements of the Act. Upon EPA approval, SIP requirements are federally enforceable under Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23.

***The California State Implementation Plan***

30.     Pursuant to Section 110(k) of the Act, 42 U.S.C. 7410(k), EPA approved the District's PSD rules ("District PSD Rules"), including Rules 130, 200, 220, 230, and 240, into the District's portion of the California SIP in 1985. 50 Fed. Reg. 30,941 (July 31, 1985) and 50 Fed. Reg. 19,529 (May 9, 1985).

31.     The federally-approved California SIP is the "applicable implementation plan," within the meaning of Section 113(b) of the Act, 42 U.S.C. § 7413(b), governing the operations of the Facility.

32.     At various locations, the District PSD Rules incorporate by reference the federal PSD regulations at 40 C.F.R. § 52.21, as amended in 1980 ("the 1980 federal PSD regulations"). 45 Fed. Reg. 52,735 (Aug. 7, 1980), codified in 40 C.F.R. § 52.21 (1984).

33.     District PSD Rule 200(a) requires that an Authority to Construct ("ATC") permit be obtained prior to starting construction, modification, operation, or use of any stationary or indirect source which may cause, potentially cause, reduce, control, or eliminate the emission of air contaminants.

7

34.    District PSD Rule 130(s7) defines a stationary source as "all units of air contaminant emitting articles, machines, equipment or other contrivances, which are located on adjacent or contiguous properties under the control of the same person and all of which are determined by the Control Officer to be related to one another through a similar product, raw material or function and are included in the same industrial classification."

35.    District PSD Rule 130(a2) defines an air contaminant, in relevant part, as "[a]ny discharge, release, or other propagation into the atmosphere directly, or indirectly, caused by man and includes, but is not limited to, . . . carbon, fumes, gases, odors, particulate matter, . . . , or any combination thereof."

36.    District PSD Rule 130(m2) defines "modification" as "any physical change in, or in the method of operation of any stationary source which increases the amount of any air contaminant emitted into the atmosphere by that source."

37.    District PSD Rule 130(o1) defines "operation" as "any physical action resulting in a change in the location, form or physical properties of a material, or any chemical action resulting in a change in the chemical composition or the chemical or physical properties of a material."

38.    District PSD Rule 220(b) provides that for any new or modified stationary source which the [District] estimates will result in "a significant net increase in emissions of any air contaminant regulated under the Act," BACT shall be determined for each air contaminant for which the significance level, as defined in Rule 130(s2), is exceeded.

39.    District PSD Rule 130(n1) defines the "net increase in emissions" as "the amount by which the sum of any increase in actual emissions from a particular physical change or change in method of operation at a stationary source, and any other increases and decreases in actual emissions at the source that are creditable in accordance with 40 C.F.R. § 52.21(b)(3) and (21), exceeds zero."

40.    District PSD Rule 130(s2) defines the significance level, in relevant part, as the potential of a new or modified stationary source to emit air contaminants that would equal or exceed 100 tons per year of CO, 40 tons per year of $NO_x$, and 15 tons per year of $PM_{10}$.

41.     District PSD Rule 220(b) further provides that the District shall analyze the effect of the new or modified stationary source on air quality for each air contaminant for which the significance level is exceeded and require that the applicant comply with the preconstruction monitoring requirements in the 1980 federal PSD regulations at 40 C.F.R. § 52.21(m) (1984).

42.     District PSD Rule 230(a) provides, in relevant part, that an ATC shall only be granted after the District has determined that a new or modified stationary source "has complied with all applicable federal PSD requirements at 40 C.F.R. § 52.21," will not cause deterioration of existing air quality in excess of the maximum allowable PSD increments, and employs BACT for each air contaminant for which the significance level is exceeded.

43.     District PSD Rule 240(a) provides, in relevant part, that a person shall not operate or use any stationary source that may emit air contaminants without first obtaining a Permit to Operate from the District.

44.     District PSD Rule 240(c) provides that no Permit to Operate shall be granted for any stationary source constructed without an ATC until the information required is presented to the District, an emission analysis is performed, and the source is altered, if necessary, and made to conform with the standards set forth in District PSD Rule 230, which incorporates the requirements of the 1980 federal PSD regulations.

### The 1980 Federal PSD Regulations

45.     The 1980 federal PSD regulations require that a new major stationary source or a major modification get a permit which states that the stationary source would meet the requirements of the federal PSD regulations prior to beginning actual construction. 40 C.F.R. § 52.21(i) (1984).

46.     The 1980 federal PSD regulations require that a new major stationary source "shall apply" BACT for each pollutant subject to regulation under the Act that it would have the potential to emit in significant amounts. 40 C.F.R. § 52.21(j)(2) (1984).

47.     The 1980 federal PSD regulations define "major stationary source" to mean, in relevant part, "any source which emits, or has the potential to emit, 250 tons per year or more of any air pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(1)(ii) (1984).

9

48.     The 1980 federal PSD regulations define "potential to emit" to mean, in relevant part, "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design." 40 C.F.R. § 52.21(b)(3) (1984).

49.     The 1980 federal PSD regulations define "significant," in reference to a net emissions increase or potential to emit, to mean 100 tons per year of CO, 40 tons per year of $NO_x$, and 15 tons per year of $PM_{10}$. 40 C.F.R. § 52.21(23)(i) (1984).

50.     The 1980 federal PSD regulations require that a major modification "shall apply" BACT for each pollutant subject to regulation under the Act for which it would result in a significant net emissions increase at the source. 40 C.F.R. § 52.21(j)(2) (1984).

51.     The 1980 federal PSD regulations define "major modification" to mean "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i) (1984).

52.     The 1980 federal PSD regulations define "net emissions increase" to mean the amount by which the sum of the following exceeds zero: "any increase in actual emissions from a particular physical change or method of operation at a stationary source" and "any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable." 40 C.F.R. § 52.21(b)(3)(i) (1984). "Actual emissions" are to be calculated in "tons per year" and should "equal the average rate . . . at which the unit actually emitted the pollutant during a two year period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. § 52.21(b)(21)(ii) (1984). Actual emissions shall be calculated using the unit's "actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period." *Id.* For a new emission unit, "actual emission shall equal the potential to emit of the unit on that date." 40 C.F.R. § 52.21(b)(21)(iv) (1984).

53.     The 1980 federal PSD regulations provide that a net emissions increase is "contemporaneous with the particular change" if it occurs between the date five years before

10

construction on the particular change commences and the date of the increase in emissions. 40 C.F.R. § 52.21(b)(3)(ii).

54. The 1980 federal PSD regulations further require that, for each pollutant emitted in significant amounts, the owner or operator of a proposed major stationary source or major modification shall: i) demonstrate that allowable emission increases from the proposed source or modification would not cause or contribute to air pollution in violation of the NAAQS; ii) model air quality; and iii) provide information necessary to perform any analysis or make any determination required under the PSD regulations, including a BACT determination. 40 C.F.R. §§ 52.21(k), (l), and (n) (1984).

**The Blue Lake Rancheria Air Quality Ordinance**

55. The Tribe adopted The Blue Lake Rancheria Air Quality Ordinance ("BLRAQO") to reduce and control discharges of pollutants into the air of the Reservation and other territory over which the Tribe has jurisdiction. BLRAQO §1.

56. The BLRAQO is intended to promote political integrity, economic security, health, safety and welfare of the Tribe, its members and all person living on, or passing through the Reservation and to protect and preserve the environment, lands, culture, religion, and natural resources of the Blue Lake Rancheria. BLRAQO §1.The BLRAQO defines "Person" as "any individual, corporation, firm partnership, joint venture, association, social club, estate, trust, the United States, Tribe, State, County, City, district or other political subdivision of any state, or any other group or combination acting as a unit." BLRAQO §2(i)

57. The BLRAQO defines "pollutant" as "any substance that will alter the quality of the air of the Blue Lake Rancheria or other territory over which the Tribe has jurisdiction…" BLRAQO §2(j).

58. The BLRAQO extends to "all persons who discharge any pollutant into the air of the Rancheria or other territory over which the Tribe has Jurisdiction."

59. The BLRAQO prohibits the "discharge of any pollutant into the air of the Rancheria or other territory over which the Tribe has jurisdiction." BLRAQO § 9(b).

60.     The BLRAQO provides that "any person who discharges any pollutant into the air of the Rancheria or other territory over which the Tribe has jurisdiction shall be liable for all costs associated with or necessary to clean up, abate, or remove said pollutants from the air of the Rancheria or other territory over which the Tribes has jurisdiction and restore the quality of the air  of the Rancheria or other territory over which the tribe has jurisdiction to the condition of the air as it existed immediately prior to the discharge."  BLRAQO § 7.

61.     The BLRAQO further provides that "[i]n the event that any person, as a result of his or her violations of this Ordinance, should proximately cause any physical damage to any other person(s) residing within, or to any real or personal property situated in, the Rancheria or other territory over which the Tribe has jurisdiction, the Tribal EPA or the person(s) adversely affected shall have the right to seek monetary and/or injunctive relief in any judicial forum of competent jurisdiction."  BLRAQO § 12.

## GENERAL ALLEGATIONS

62.     The Facility was first constructed in 1984 by Ultrapower 3 LLC and began commercial operations in 1987.

63.     At all times relevant to this Complaint, the Facility has been and is composed of one biomass-fired boiler, one propane gas burner, two diesel compression ignition engines, various wood transportation equipment, an office building, various air quality control equipment, and a wood storage area.

64.     At all times relevant to this Complaint, the Facility has been assigned a Standard Industrial Classification #4911 for Electric Services.

65.     At all times relevant to this Complaint, the Facility has had and has a steam turbine rated at 11.7 megawatts (MW).

66.     At all times relevant to this Complaint, the Facility has had and has the potential to emit more than 250 tons per year of pollutants subject to regulation under the Act, including, but not limited to, CO.

67.     At all times relevant to this Complaint, the Facility has had and has the potential to emit over 100 tons per year of CO, 40 tons per year of $NO_x$, and 15 tons per year of $PM_{10}$.

12

68.     At all times relevant to this Complaint, the Facility was and is a "major emitting facility" within the meaning of 42 U.S.C. § 7479(1) and a "major stationary source" within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(a) (1984).

69.     At all times relevant to this Complaint, the Facility was and is a "stationary source" within the meaning of District PSD Rule 130(s7).

70.     On May 1, 1999, the Facility ceased operations.

71.     For nine years, between 1999 and 2008, equipment at the Facility was idle and minimal maintenance was performed on the equipment.

72.     From 2000 through 2008, the Facility reported no emissions of CO, $NO_x$, or $PM_{10}$ to the California emissions inventory and, in 2009, it was removed from California's emissions inventory.

73.     Defendant acquired the Facility on January 17, 2008 and owned the Facility until on or about September 24, 2010.

74.     Defendant has operated the Facility since January 17, 2008 and currently operates the Facility.

75.     Between at least September 4, 2008 and April 30, 2010, Defendant undertook physical projects at the Facility in order to restart the Facility, spending over $6 million on the boiler island, electrical substation, fuel conveying system, turbine, emissions control devices, and other equipment.

76.     Defendant entered into one or more contracts by August 2008 with one or more vendors to complete at least a portion of this physical work.

77.     The work undertaken at the Facility between September 4, 2008 and April 30, 2010, and its subsequent restart constituted "construction" as defined in 42 U.S.C. § 7479 and "modifications" as defined in 42 U.S.C. § 7411(a) and District PSD Rule 130(m)(2).

78.     Defendant restarted operations at the Facility on or around April 30, 2010.  Upon restarting, the Facilities emissions forced several hundred nearby residents from Blue Lake to flee the city.

79.     In 2010, the Facility emitted 289 tons of CO, 44.8 tons of $NO_x$, and 11.6 tons of $PM_{10}$.

80.     In 2011, the Facility emitted 118.7 tons of CO, 18 tons of $NO_x$, and 4.8 tons of $PM_{10}$.

81.     In 2012, the Facility emitted 501.5 tons of CO, 75.4 tons of $NO_x$, and 20.1 tons of $PM_{10}$.

82.     The Facility has a long history of violating of its Title V Permit and/or District, State, and Federal laws relating to violations of opacity limits, operation of the facility air pollution control equipment, and excess particulate matter emissions.

83.     Between April 22, 2010 and May 14, 2010, the District issued twelve violation notices to Defendants.

84.     Between April 22, 2010 and August 8, 2010, the District documented at least an additional one hundred and eleven violations of the Title V Permit for particulate matter, carbon monoxide, and nitrogen oxide emissions.

85.     On or about August 10, 2010, the District sent a letter to Blue Lake Power documenting that "BLP continues to operate contrary to allowable conditions contained in the [Title V Permit] and District regulations."  The District stated that it had:

> spent a considerable amount of time and energy in assisting BLP in bringing a plant that has been non-active for a considerable amount of time up to operating specifications when the plant should have been in compliance from the very first day of start-up in Mid-April 2010.  There have been a considerable number of problems in the almost 160 days since re-start for a plant that should have been operating in compliance from day one.

86.     In its August 10, 2010 letter, the District stated that Blue Lake Power had mischaracterized six emissions violations as caused by breakdowns of equipment at the Facility when really such violations were cause by operator error or faulty procedures.

87.     In its August 10, 2010 letter, the District further stated that Blue Lake Power violated its permit and District regulations by failing to timely report three of the seven incidents, and concluded:

14

Because each of these instances occurred after several discussions with BLP representatives by several representatives of the District specifically identifying Breakdown/Malfunction procedures contained in BLP's permit and District regulations, the District considers these violations egregious and willful acts.

. . .

Any future violations identified by the District of a similar nature found within the next 365 days will be treated by the District as a willful and intentional emission of an air contaminant.

88.     In 2011, the District entered into a Settlement Agreement with Blue Lake Power to resolve the 2010 permit violations at the facility.  The Settlement Agreement included a penalty of $1,380,000 and required a comprehensive environmental audit of the facility as well as other programmatic changes.

89.     On or about April 9, 2013, Blue Lake Power wrote a letter to the District claiming it had complied with all requirements of the Settlement Agreement except installing a moisture meter on the fuel infeed system to monitor the fuel moisture level.  Even after making these changes, the facility continued to experience permit exceedances.

90.     In 2013, the Facility applied for a Title V Federal Operating Permit renewal for the Facility.  The application estimated the emissions of criteria pollutants and hazardous air pollutants from the facility, both without controls and also with proper operation of the proposed control technology for the Facility.

91.     Between July 31, 2013 and December 21, 2014, the Defendants reported forty six breakdown/malfunction events.

92.     In 2014, the District and U.S. EPA Region XI issued a Notice of Violation to the Facility.

93.     Between September 24, 2014 and April 2, 2015, the Facility reported fifteen permit violations.

**FIRST CLAIM FOR RELIEF: CLEAN AIR ACT**

94.     Paragraphs 1 through 85 are realleged and incorporated herein by reference.

95.     Defendant was required by Section 165(a) of the Act, 42 U.S.C. § 7475, to obtain a preconstruction permit, in accordance with the requirements of Section 165, 42 U.S.C. § 7475,

and the District PSD Rules approved into the California SIP, because the Facility was a major emitting facility on which construction was commenced after August 7, 1977.

96.    District PSD Rule 200(a) required Defendant to obtain an ATC permit from the District for the construction performed between July 2008 and April 2010 at the Facility and its subsequent operation, because Defendant's activities constituted construction, modification, operation, or use of a stationary source which may cause, potentially cause, reduce or eliminate the emission of air contaminants.

97.    The construction, modification, and operation of the Facility resulted in a "significant net increase in emissions" of CO, $NO_x$, and $PM_{10}$ from the Facility after 2010, as defined in the 1980 federal PSD regulations at 40 C.F.R. § 52.21 b)(3)(i )(1984) and in District PSD Rules 130(n1) and 130(s2), exceeding 100 tons per year of CO, 40 tons per year of $NO_x$, and 15 tons per year of $PM_{10}$.

98.    In order to obtain an ATC, Defendant was required by District PSD Rule 230 to comply with the 1980 federal PSD regulations and to install BACT at the Facility, because the work undertaken at the Facility between July 2008 and April 30, 2010 and its subsequent restart were "major modifications," as defined in the Act and 40 C.F.R. § 52.21(b)(2)(i) (1984), and incorporated into the District's PSD Rules and the California SIP.

99.    Alternatively, Defendant was required by District PSD Rule 230 to comply with the 1980 federal PSD regulations and to install BACT at the Facility, because the Facility is a new major stationary source with the potential to emit CO, $NO_x$, and $PM_{10}$ in significant amounts, as defined in 40 C.F.R. § 52.21 (1984) and District Rule 130.

100.    Defendant failed to comply with the PSD requirements in the Act and the District rules approved and incorporated into the California SIP with respect to the 2008-2010 construction and operation of a new major stationary source or major modification, and subsequent operations at the Facility. Among other things, Defendant: (i) undertook construction or modification without first obtaining an ATC that included PSD requirements; (ii) failed to provide information required to make necessary determinations or analyses required by the PSD program; (iii) undertook construction or modification without undergoing a BACT determination

16

in connection with the construction; (iv) undertook construction or modification without installing BACT for control of CO, NO$_x$, and PM$_{10}$ emissions; (v) has failed to operate BACT for control of CO, NO$_x$, and PM$_{10}$ emissions; (vi) has failed to operate in compliance with BACT emissions limitations, including limitations that are no less stringent than applicable standards under Section 111 of the Act; (vii) operated the Facility without first obtaining an ATC; and (viii) operated the Facility without a Permit to Operate that included PSD requirements.

101.    Defendant has violated and may continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the PSD regulations contained in the federally enforceable District PSD Rules approved into the California SIP.

102.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, Defendants are liable for injunctive relief and for civil penalties of up to $37,500 per day for each violation occurring after January 12, 2009.

**SECOND CLAIM FOR RELIEF:  PRIVATE NUISANCE**

103.    Paragraphs 1 through 102 are realleged and incorporated herein by reference.

104.    Under California law, "anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance."  Cal. Civ. Code § 3479.

105.    District Rule 104.1.1 further provides that "[n]o person shall discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance or annoyance to any considerable number of persons or to the public or which endanger the health, comfort, repose or safety of any such persons or the public or which cause or have an natural tendency to cause injury or damage to business or property."

106.    The Reservation is held in trust by the United States for the Tribe.

107.    Tribe members live on the Reservation in proximity to the Facility.

108.    Defendant's actions in operating the Facility have created a conditions that are harmful to health of the members of the Tribe by their exposure to constituents of concern in the air emissions from the Facility.

109.    The Facility's air emissions have degraded the ambient air quality in and around the Reservation.

110.    Defendant's actions in operating the Facility have created conditions that are indecent and offensive, including odors and particulate deposition on and around the Reservation, including on and around Tribe members' residences and property.

111.    The emissions from the Blue Lake Power Plant have obstructed the Tribe's members' free use and enjoyment of their property.

112.    Defendant's operation of the Facility resulted in numerous violations of its Title V Permit and/or District, State, and Federal laws relating to violations of opacity limits, operation of the facility air pollution control equipment, and excess particulate matter emissions.

113.    The Tribe has in no way consented to Defendant's unreasonable and harmful emissions.

114.    The seriousness of the harm to the Tribe, its members, and its property outweighs any public benefit of Defendant's excess emissions.

115.    Defendant has caused an unlawful nuisance under California law.

116.    If allowed to restart the Blue Lake Power Plant, Defendant's excess emissions will continue to cause an unlawful nuisance.

### THIRD CLAIM FOR RELIEF:  PUBLIC NUISANCE

117.    Paragraphs 1 through 116 are realleged and incorporated herein by reference.

118.    Defendant's actions, including failure to properly maintain equipment and pollution control devices as well as failure to properly operate such equipment and devices, have resulted in excess air emissions from the Facility.

119.    Defendant's emissions have degraded the ambient air quality in and around the Facility, including on the Reservation, as well as surrounding communities, causing a public nuisance.

120.    Particulate matter from the Facility has harmed land and property surrounding the Facility.

121.    Excess emissions from the Facility have degraded views in the area due to opacity exceedances as well as dispersion of particulate pollution from the Facility.

122.    Defendant's operation of the Facility resulted in numerous violations of its Title V Permit and/or District, State, and Federal laws relating to violations of opacity limits, operation of the facility air pollution control equipment, and excess particulate matter emissions.

123.    The Facility has faced numerous complaints from the Tribe and residents of Blue Lake City due to the deposits of dark oily particulate matter on cars, homes, and gardens. Residents complained that the particulate matter covers trees around the city even causing some to die.  Many of the complaints registered against the facility describe excessive particulate emissions during the night.

124.    Environmental groups have observed black particulate matter on the surface of the Mad River, which is listed as an impaired waterway and is also home to numerous species protected under the Endangered Species Act.

125.    On April 29, 2010, the Facility beginning discharging excessive amounts of brown smoke and particulate matter forcing several hundred residents from Blue Lake to flee the city, only returning days later, after the air had cleared.

126.    The Tribe has been specially harmed by the excess emissions from the Facility.

127.    The Reservation is located less than half of a mile from the Facility, and has been disproportionately adversely impacted by the harmful and dangerous emissions from the Facility.

128.    Many members of the Tribe are elders or children, who may be more susceptible to adverse health outcomes caused by air pollution, especially particulate matter.  The excess emissions from the Facility have put members of the Tribe at increased risk for certain cardiopulmonary and respiratory illnesses.

129.    The Tribe and its members have suffered damage to their property from the emissions from the Facility.

130.    The Tribe has not consented to the excess emissions from the Facility in any way.

131.    Defendant's excess emissions have caused a public nuisance.

132.    If allowed to restart the Facility, it is very likely that Defendant's excess emissions will continue to cause a public nuisance.

**FOURTH CLAIM FOR RELIEF:  TRESPASS**

133.    Paragraphs 1 through 134 are realleged and incorporated herein by reference.

134.    California law recognizes trespass for the unlawful interference with the possession of real property.

135.    Particulate matter from the Facility has invaded the Reservation and property that is used and occupied by members of the Tribe, without the consent of the Tribe or its members.

136.    The particulate matter that has settled on Plaintiff's property has caused actual property damage and increased risk of harm to human health.

137.    Defendant has not cleaned or removed the particulate matter from any property owned, occupied, or possessed by the Tribe and/or its members.

138.    The excess emissions from the Facility are a substantial factor in causing the injury to the Tribe and its members.

139.    Defendant has illegally trespassed on the Tribe's land and property and that of its members.

140.    If allowed to restart, the Blue Lake Power Plant excess emissions will continue to cause an illegal trespass on the Tribe's land and property and that of its members.

**FIFTH CLAIM FOR RELIEF:  NEGLIGENCE**

141.    Paragraphs 1 through 140 are realleged and incorporated herein by reference.

142.    The Reservation is located less than half of a mile from the Facility.

143.    Defendant has consistently and repeatedly violated its Title V Permit and/or District, State, and Federal laws relating to violations of opacity limits, operation of the facility air pollution control equipment, and excess particulate matter emissions.

144.    Opacity is a visual measurement of the amount of light attenuated by particulate matter in effluent emissions. The percentage of visible light attenuated is defined as the opacity

of the emissions.  Opacity often is used as an indicator of the degree of particulate matter emissions.

145.    Opacity also is used to evaluate whether a source is being maintained and operated properly.  *See* 40 C.F.R. § 60.11(d) ("At all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source."); 40 C.F.R. § 63.6(e).

146.    Defendant's conduct has consistently and repeatedly fallen below that standard of care required in operating the Facility.  In fact, from 2014 to 2015 the Defendant reported to the District that multiple emissions violations were caused by improper operation of the Facility, and /or improper maintenance of equipment.

147.    Plaintiff's property, and that of its members, has been physically damaged by noxious odors, pollutants, and air contaminants emitted from the Facility.

148.    The health of the members of the Tribe has been physically damaged by noxious odors, pollutants, and air contaminants emitted from the Facility as a result of Defendant's conduct.

149.    Defendant's conduct was a substantial factor in causing the above harm.

150.    Had Defendant properly operated and maintained its equipment, it would not have exceeded its permit and would not have emitted odors, pollutants, and air contaminants onto Plaintiff's property.

151.    Defendant has had exclusive control over the Facility at all times relevant to this Complaint.

152.    It is likely that if allowed to restart, the Facility's emissions will again damage Plaintiff's property and cause additional damage.

21

## SIXTH CLAIM FOR RELIEF: VIOLATION OF BLUE LAKE RANCHERIA AIR QUALITY ORDINANCE

153.    Paragraphs 1 through 152 are realleged and incorporated herein by reference.

154.    Defendant Blue Lake Power has discharged emissions from the Facility into the air of the Reservation and other territories over which the Tribe has jurisdiction.

155.    Defendant Blue Lake Power's discharge of emissions from the Facility has altered the quality of air of the Reservation and other territories over which the Tribe has jurisdiction.

156.    Additionally, the discharge of emissions from the Facility has, among other things:

a.    Caused damage to the health of the members of the Tribe;

b.    Caused damage to the real property of and on the Reservation and other territories over which the Tribe has jurisdiction; and

c.    Caused damage to the personal property on the Reservation and other territories over which the Tribe has jurisdiction.

157.    Defendant Blue Lake Power has discharged particulate matter from the Facility into the air of the Reservation and other territories over which the Tribe has jurisdiction.

158.    Defendant Blue Lake Power's discharge of particulate matter from the Facility has altered the quality of air of the Reservation and other territories over which the Tribe has jurisdiction.

159.    Additionally, the discharge of particulate matter from the Facility has, among other things:

a.    Caused damage to the health of the members of the Tribe;

b.    Caused damage to the real property of the Reservation and other territories over which the Tribe has jurisdiction; and

c.    Caused damage to the personal property on the Reservation and other territories over which the Tribe has jurisdiction.

d.    Defendant had exclusive control over the Facility at all times relevant to this Complaint.

160.    Defendant's conduct was a substantial factor in causing the above harm.

161.    Defendant's conduct as alleged above violated Section 7 and Section 9(b) of the BLRAQO.

162.    It is likely that if allowed to restart, the Facilities' discharge of emissions and particulate matter will again cause the above harm in violation of the BLRAQO.

## SEVENTH CLAIM FOR RELIEF:  EQUITABLE INDEMNITY

163.    Paragraphs 1 through 162 are realleged and incorporated herein by reference.

164.    The release of hazardous substances from the Facility, as alleged above, was the sole, direct, and proximate result of Defendants conduct.

165.    Plaintiffs are entitled to equitable indemnity from Defendant because the sole and/or proximate cause of Plaintiff's damages were the conduct of Defendant, and not any act, conduct, or failure to act of Plaintiff.

166.    Under general equitable principles and rules governing this action, Plaintiff is entitled to equitable indemnity from Defendant for the Defendant's share of the responsibility for damages to Plaintiff, as determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Blue Lake Rancheria Tribe respectfully request that this Court grant the following relief:

a.    Issue a temporary restraining order enjoining the Defendant from operating the Facility except in accordance with the Act and any applicable regulatory requirements;

b.    Permanently enjoin Defendant from operating the Facility except in accordance with the Act and any applicable regulatory requirements;

c.    Order the Defendant to apply for and comply with permits for the Facility that are in compliance with the requirements of the PSD program, the California SIP, and the District PSD Rules;

d.    Order the Defendant to remedy its past and ongoing violations by, among other things, requiring Defendant to install and operate BACT at the Facility to control emissions of CO, $NO_x$, and $PM_{10}$;

e.    Require Defendant to mitigate the injury to the environment caused by its past non-compliance;

f.    Assess a civil penalty against Defendant in favor of the United States under the Act for past violations in an amount of up to $37,500 per day for violations occurring after January 12, 2009;

g.    Assess a civil penalty against Defendant in favor of the District under California Health and Safety Code sections 42402 through 42403 as follows: not more than $10,000 per day for each violation for which Defendant is strictly liable; not more than $25,000 per day for each violation where Defendant negligently emitted air pollution in violation of a District rule; not more than $75,000 per day for each violation where Defendant willfully and intentionally emitted air pollution in violation of a District rule;

h.    Declare that the excess emissions from the Facility constitute a private nuisance;

i.    Award Plaintiff damages caused by Defendant's private nuisance;

j.    Declare that the excess emissions from the Blue Lake Power Plant constitute a public nuisance;

k.    Award Plaintiff damages caused by Defendant's public nuisance;

l.    Declare that Blue Lake Power has illegally trespassed on property owned and/or possessed by the Blue Lake Rancheria Tribe and/or its members;

m.    Award Plaintiff damages caused by Defendant's trespass;

n.    Declare that Defendants were negligent in their operation and maintenance of the Facility;

o.    Award Plaintiff damages caused by Defendant's negligence;

p.    Enjoin Defendant from emitting excess particulate matter from the Facility

in the future;

q.    Award the Tribe its costs, including attorneys' fees, in this action; and

r.    Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Justin R. Panitchpakdi
Marc A. Shapp, Esq.
CA Bar No. 266805
Justin R. Panitchpakdi, Esq.
CA Bar No. 301434
Hunsucker Goodstein PC
3717 Mt. Diablo Blvd., Ste. 200
Lafayette, CA, 94549
(925)284-0840
mshapp@hgnlaw.com
jpanitchpakdi@hgnlaw.com

Michael D. Goodstein, Esq.
DC Bar No. 469156
Anne E. Lynch
DC Bar No. 976226
Hunsucker Goodstein PC
5335 Wisconsin Avenue NW, Ste. 360
Washington, DC 20015
(202)895-5380
mgoodstein@hgnlaw.com
alynch@hgnlaw.com

*Attorneys for Blue Lake Rancheria Tribe*

# EXHIBIT B

# BLUE LAKE RANCHERIA

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

April 4, 2016

John C. Cruden
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice – ENRD
P.O. Box 7611
Washington, D.C. 200444-7611
By email to: pubcomment-ees.enrd@usdoj.gov

**Re: *United States and North Coast Unified Air Quality Management District* v. *Blue Lake Power LLC,* D.J. Ref. No. 90-5-2-1-11038**

Dear Assistant Attorney General Cruden,

The Blue Lake Rancheria, California, a federally recognized Native American tribal government ("Tribe") respectfully submits these comments as approved by the Tribal Council (and in addition to the comments the Tribe directed its attorney David Rapport to submit separately) regarding *United States and North Coast Unified Air Quality Management District* v. *Blue Lake Power LLC,* D.J. Ref. No. 90-5-2-1-11038 ("Complaint"), and the proposed Consent Decree.

The Tribe considers the proposed Consent Decree to be inadequate, improper, and inappropriate, and not in the public interest. Its lenient, ineffective terms will not create deterrence of future regulatory violations by Blue Lake Power, LCC ("Blue Lake Power") given Blue Lake Power's repeated and demonstrated inability to operate in compliance to date, and under similar 'corrective' agreements and settlements. The proposed Consent Decree does not adequately protect tribal citizens and environment, the Mad River, and all other affected residents and environments, against substantial endangerment to the public health, welfare and the environment arising at – and posed by – the Blue Lake Power facility.

**In the public interest, the Tribe urges withdrawal of this proposed Consent Decree, and to proceed with litigation or modify the Consent Decree to include larger penalties and far more stringent compliance activities, with independently verifiable proof of Blue Lake Power's financial capability to implement, and its technological capability to operate in compliance.**

The plant is currently idle, and it is inappropriate that Blue Lake Power is/would be allowed to restart operations at its discretion given the serious nature of the errors in its permitting structure, its inability to operate in compliance throughout the majority of its operating history, and the serious, chronic health and environmental impacts caused by past emissions and the likely potential of future violations. **The Tribe seeks the relevant permitting and enforcement agencies and/or the Courts to require Blue Lake Power to demonstrate its operational and financial ability to comply with all regulations** <u>before a restart is allowed under any circumstances.</u> **The Tribe requests Blue Lake Power be required to apply for a new Authority to Construct/Permit to Operate, in compliance with all Prevention of Significant Deterioration framework requirements.** This should have been done 5 years ago, but setting that aside,

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

even the major modifications sought and compliance activities contained in the proposed Consent Decree compel this process now.

At a minimum, Blue Lake Power should not be allowed to restart until all of the Compliance Requirements of the proposed Consent Decree are implemented and complete, and any operational testing to prove implementation and completion is conducted and verified by a third party.

The Tribe also seeks comprehensive monitoring of all emissions, with a focus on particulate matter, directly measuring quantity and constituency of particulates in real time. The Tribe recommends a joint monitoring station in partnership with the North Coast Unified Air Quality Management District ("District") and the U.S. Environmental Protection Agency ("EPA"), paid for by Blue Lake Power, and which would meet all the requirements of all regulations and processes relating to monitoring (e.g., California Air Resources Board Primary Quality Assurance Organization).

Blue Lake Power's chronic particulate matter, light, noise, ash runoff, and other violations, including but certainly not limited to the March 2014 Finding and Notice of Violation which suggests that the permit in force from 2010-present is not valid, have contributed to its categorization as a "High Priority Violator" by the EPA. Blue Lake Power's multiple, chronic violations may have been avoided, had the proper Authority to Construct and Prevention of Significant Deterioration permits/standards been applied prior to starting the plant in ~2010.

In addition, Blue Lake Power has defaulted on multiple financial obligations – including non-payment of ~$30,000 in Title V Permit Fees, which should have resulted in immediate forfeiture of their Permit to Operate – and various defaults on lease and utility payments to the City of Blue Lake over the last 7 years, among other defaults and current debts (see Financial Considerations below).

All the while Blue Lake Power has amassed over $7 million in federal grants/subsidies and other public/grant monies, and has reaped the additional value of unpaid bills that have been negotiated away.

Other Blue Lake Power issues have included uncontrolled biomass fuel fires, which were mitigated with hundreds of thousands of gallons of water from the City of Blue Lake (the bills for which, as the Tribe understands it, were not paid).

**Background and History**

The ~11MW biomass-fueled power plant currently owned/operated by Blue Lake Power is located in the City of Blue Lake's industrial park, >0.5 miles from the Tribe's trust lands.

Construction on the plant began over 30 years ago. The initial facility was first issued an Authority to Construct permit from the North Coast Unified Air Quality District ("District") on January 12, 1984. Construction of the facility was initially completed in 1986 and operations began in 1987.

The facility ceased operations on April 29, 1999. Between May 1, 1999 and 2008, all equipment at the facility was idle, and there was only one employee working at the facility part time, and minimal or no maintenance was performed during that period on the equipment at the facility, which largely consisted of turning on the conveyers and fans manually. A significant amount of the preventative maintenance (e.g., turning the giant boiler/turbine machinery to

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

prevent bowing and structural damage) was not done. The fuel storage area had sapling alder and willows growing on it, indicating lack of use. A representative of the prior owner of the facility made statements indicating that the plant was permanently shuttered and future plans for the facility included dismantling the plant completely and/or shipping the plant out-of-state.

Blue Lake Power purchased the facility on January 17, 2008 and, between 2008 and 2010, Blue Lake Power undertook all-inclusive construction work at the facility, including major modifications and other "reconditioning" work on the boiler island, the electrical substation, the fuel conveying system, turbine, generator, condenser, water treatment, cooling tower, boiler feed pumps, circulating water pumps, roof and wall tubes, propane start system, emissions control devices including "multicyclone" and electrostatic precipitator, ash handling equipment, rotary valves, fuel dryer, "soot blowers", building sprinkler systems, air compressors, "wet scrubber for stack", and other equipment and/or repairs. The cost of this work was over $6,000,000.

Blue Lake Power did not apply for or obtain a new Authority to Construct permit for the work or for the restart of the facility, but rather claimed an Authority to Construct permit was not necessary.

The District did not disagree and/or impose those requirements, or require Prevention of Significant Deterioration requirements or State Implementation Plan (SIP) process (please see Complaint for a complete discussion of what should have been applied to Blue Lake Power).

Blue Lake Power began testing the facility on December 20, 2009 and restarted operation of the facility on April 20, 2010, almost 11 years after the facility had stopped operating, and after 2.4 years of "major modifications." Blue Lake Power did not obtain a new Permit to Operate before restarting operations or resuming use of the facility, but rather operated under the *prior* facility's original Permit to Operate.

Between April 2010 and May 2011, Blue Lake Power had numerous compliance issues reported. For activity beginning in April 22, 2010 and continuing through May 14, 2010, the District issued twelve (12) Notices of Noncompliance to Blue Lake Power for violating the conditions of its Permit to Operate and/or violations of District, state, and federal laws pertaining primarily to opacity limitations and excess particulate matter emissions.

For activity beginning in April 2010 and continuing through August 2010, the District was aware of at least one hundred and eleven (111) alleged violations by Blue Lake Power in the operation of its facility.

On May 20, 2011, Blue Lake Power entered into a Settlement Agreement with the District for the Notices of Noncompliance described above. That settlement included civil penalties of one million three hundred eighty thousand dollars ($1,380,000) – and included the requirement in Section 1. A.:

> "Blue Lake Power shall immediately refrain from operating any article, machine, equipment or other contrivance in violation of its Permit to Operate NCU 097-12, any successor permit thereto, or in violation of any District, State, or Federal order, rule or regulation prohibiting or limiting the discharge of contaminants into the air."

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

The civil penalties and injunctions of that Settlement Agreement are much more stringent than the current proposed Consent Decree, and did not result in Blue Lake Power's compliance. The Tribe has every reason to assume the proposed Consent Decree will have the same result.

Since the May 20, 2011 Settlement Agreement, the District has nevertheless continued to receive numerous complaints from citizens of the Blue Lake area regarding observed violations by Blue Lake Power.

Importantly, field reports by the District indicate that a number of the requirements of the Settlement Agreement were observed to be incomplete as of April 15, 2013 – almost two (2) years later (see District Field Reports - the District can certainly provide these Field Reports upon request). The District, however, has not issued any new notices of noncompliance against Blue Lake Power in these matters.

On March 3, 2014, the EPA issued a Finding and Notice of Violation against Blue Lake Power, asserting numerous violations of the Clean Air Act.

Blue Lake Power has continued to operate the facility at times after the March 3, 2014 EPA action in further violation of the Clean Air Act.

As of this writing, the Tribe understands that the Blue Lake Power biomass plant is currently idle, due to voluntary actions by Blue Lake Power. The Tribe also understands that Blue Lake Power does intend to resume operation of the facility. One explanation could be the owners sold their power purchase agreement back to the issuing utility to purposely go idle – and laying off at least 16 employees in the process (source: *Eureka Times Standard*) – and are waiting for the passage of California Assembly Bill 590 or similar legislation, which could make significant funds available to 'dormant' biomass plants for retrofits.

**Tribe Support of Biomass Power**
The Tribe has a long history of advocacy for biomass energy technology, including a 1983 letter from the Tribe supporting the initial opening of this same biomass plant (formerly called "Ultrapower").

The Tribe also provided an initial loan to Blue Lake Power, LLC for the 2010 restart of this same biomass power plant, because it believed the claims by Blue Lake Power that emissions were going to be tightly controlled, that jobs would result, and that the plant would create significant revenue for the City of Blue Lake. (None of these claims turned out to be completely valid; please also see financial section below.)

In 2012, in a completely separate project, the Tribe invested in a small, distributed-generation 175kW biomass-fueled power system of its own on the Rancheria.

The Tribe believes in the value of biomass-fueled power, especially as it relates to creating economic uses for hazardous fuels in our overgrown forests that have resulted in catastrophic "megafire" wildfires in recent years. The Tribe also supports biomass power for the jobs and revenue it can provide *if it is operated in compliance with regulations* and has a feasible business plan – which is not the case with Blue Lake Power.

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

**Tribal and Community Health and Environmental Concerns Related to Blue Lake Power Emissions and Non-compliant Operations**

"People exposed to fine particles over a long period of time have more heart and lung problems than people who are not breathing this kind of air pollution. Lowering PM levels would prevent deaths, mostly from heart attacks and heart disease. Studies have shown a 15% decrease in the risk of heart disease deaths with every PM2.5 decrease of 10ug/m3 (micrograms per cubic meter)." ... Small particles are the most concerning because they are most likely to cause health problems. Their small size allows these particles to get into the deep part of your lungs. Being exposed to any kind of particulate matter may cause increased emergency department visits and hospital stays for breathing and heart problems, breathing problems, asthma symptoms to get worse, adverse birth outcomes, such as low birth weight, decreased lung growth in children, lung cancer, and early deaths.

Sensitive people, including older adults, people with diseases such as asthma or congestive heart disease, and children, are more likely to be affected by contact with PM2.5."

Source: Centers for Disease Control and Prevention Website
http://ephtracking.cdc.gov/showAirHIA.action

Seventy five percent (75%) of the Tribe's membership is comprised of elders and children. The particulate matter emissions from the Blue Lake Power biomass plant are clearly a danger to public health.

Many tribal elders and other Rancheria residents have suffered related health impacts including breathing and heart problems, chronic respiratory illnesses, pneumonia, and asthma. Tribal members and other Rancheria residents have experienced increased emergency department visits and hospital stays for these issues.

For almost 3 decades, the Tribe has endured the impacts – particulate matter, noise, light, lead, arsenic, ammonia, and other types of pollution – caused by this plant which in turn cause and contribute to these chronic health conditions.

Since the plant restarted operations in ~2010, the Blue Lake Rancheria tribal members have registered hundreds of complaints with the Tribe regarding fine, dark-colored/black particulate matter blanketing their houses, cars, vegetation (including mature trees, fruit, and vegetable gardens), and window sills and other exterior and interior surfaces, often with an oily texture that makes it very difficult to remove. And this is just the particulate matter that is *visible*.

Over the last approximately 4 years, these complaints have intensified, and (prior to the plant shutting down in May of 2015) the majority of complaints received by the Tribal Office in the period from 2012-2015 state that the blanketing of dark-colored particulates occurred *nightly*. (It is reasonable to assume that particulate matter emissions would occur at night, when it is dark and there is no way to independently, visibly prove or disprove emissions compliance.)

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

Tribal Environmental Programs staff observed black particulates on the surface of the Mad River, a waterway that is already classified as impacted for turbidity and temperature relevant to endangered and threatened species it contains.

Blue Lake Power has been cited with a water quality discharge violation from the California Department of Fish and Wildlife (please see separate attachment). Trees in the vicinity of the plant are coated in this black soot-like material, and some are dying.

**Complaint Reporting Blue Lake Power Emission and other Impacts**
The Tribe has aggregated complaints regarding Blue Lake Power issues from its members and other residents on tribal lands and forwarded those complaints to the District, California EPA, and U.S. EPA.

The City of Blue Lake has received hundreds of reported complaints from its citizens regarding Blue Lake Power issues, as witnessed by tribal staff at various City Council, City Planning Commission, and other public meetings, and through documentation forwarded to the Tribe by affected citizens.

The District has received thousands of reported complaints regarding Blue Lake Power issues in total.

The Tribe has repeatedly reported emissions complaints and issues to the District and state and federal EPA contacts. Examples include:

- The Tribal Environmental Programs Office email correspondence to California EPA dating back to 2013, most without response from EPA.
- Government-to-government consultation with EPA in September of 2015.
- The Tribe submitted comments regarding its concerns about particulate pollution during the Title V Permit renewal public comment period, hand-delivered by Jacob Pounds, Tribal Environmental Programs Technician, to the District at the public meeting held at the City of Blue Lake's City Council Meeting (there was no meeting with the Tribe initiated by the District) on July 2, 2013 (interestingly close to the 4th of July holiday). To date the Tribe has had no substantive response to this comment letter (see further discussion below).
- The Tribe communicated its concerns to the plant operators through multiple meetings with Glenn Zane, plant owner, Walter Nystrom, plant manager, Arla Ramsey, Vice Chair of the Tribe and Jana Ganion, Energy Director. During the in-person meetings, the Tribe gave Mr. Zane a thorough tour of the property and the severe fly ash fallout that was present.
- The Tribe also presented photos and other evidence and documentation of the issue to all involved parties.

Despite concerted collection of complaints, photos, sampling, other evidence, and repeated requests to Blue Lake Power to solve emissions issues, reports on the same to the District and the state and federal EPA representatives, requests for greater enforcement, more particulate matter monitoring, and more communication around chronic violations by the plant operators, these actions and requests by the Tribe are consistently ignored and/or dismissed as inaccurate.

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

As an example, a member of the tribal staff called the District to report emissions complaints and violations and spoke with the Compliance and Enforcement Manager on 11/4/2013. During that telephone conversation, the District Manager stated that, "he was certain the plant was not the cause" of the emissions in question.

The District's permitting contact's response to the Tribe's letter submitted during the public comment period of Blue Lake Power's Title V Permit renewal was that it 'did not require a response from the District because there was "not anything of substance to respond to." (Please see attached BLR Letter to NCUAQMD 7.2.13 Low Res.)

Further, outreach to Region 9 EPA staff has been unproductive. As an example, Tribal Environmental Programs department staff has sent multiple emails to the Region 9 Air Permitting contacts to request permitting information on Blue Lake Power, beginning in May of 2014. To date – almost 2 years later – they have received no email response.

**Financial Considerations**
The proposed Consent Decree states the 'limited ability of Blue Lake Power to pay a civil penalty in this matter' (see Consent Decree). In this case the total penalties amount to $15,000. The 'limited ability to pay was determined by the United States based on Financial Information 'that Blue Lake Power made available.'

Setting aside for now questions regarding the accuracy of the Financial Information provided by Blue Lake Power, there are serious concerns between the proposed Consent Decree's finding of limited ability to pay, and the assumption that Blue Lake Power is - at the same time - somehow magically able to fund the considerable new work to modify the plant, complete new studies and plans, and uphold all the new compliance activities in the proposed Consent Decree, the estimated cost of which is over $700,0000 (statements by EPA/DOJ in meeting with BLR on March 23, 2016).

As noted above and below, Blue Lake Power has a long, public, and documented history of defaulting on its financial obligations — and defaulting on the resulting settlement agreements that address those original defaults. It also has a history of not upholding the compliance activities required by its settlement agreements.

Blue Lake Power has continuously claimed financial hardships whenever an issue arises. The end result is that Blue Lake Power has been able to exploit their statements of financial precariousness to be able to operate as a willful and egregious polluter.

In fact, with the assistance of the District and the City of Blue Lake through settlements and extensions of payments and compliance activities (and with this latest proposed Consent Decree, if it is approved as is) Blue Lake Power has been successful in avoiding the majority of the regulation that applies to biomass power plants and has operated for far less out-of-pocket expense (once all their debt forgiveness has been factored in) than their competitors. There are two (2) similarly sized biomass plants in our region, and they have been able to operate in compliance relative to Blue Lake Power's operations.

Blue Lake Power's violations have triggered the majority of the sub-components of both "Benefit from Delayed Costs" and "Benefit From Avoided Costs" ("Clean Air Act Stationary Source Civil Penalty Policy"), including:

- Failure to install equipment needed to meet emission control standards. [Multiple instances as demonstrated in Notices of Violation, and Settlement Agreements.]

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

- Failure to effect process changes needed to reduce pollution. [See particulate matter pollution, initial fuel management plan(s) and settlement fuel management plans, among others in Notices of Violation and Settlement Agreements.]
- Failure to test where the test still must be performed. [Fly ash runoff into Mad River, see California Fish & Wildlife letter.]
- Failure to install monitoring equipment. [District comments that 'opacity has loose correlation to particulate matter measurements.']
- Disconnecting or failing to operate and maintain existing pollution control equipment (or other equipment if it affects pollution control). [Multiple fires, and other issues with the electrostatic precipitator (ESP) equipment as reported by Blue Lake Power and ESP repair vendors to the Tribe.]
- Failure to employ a sufficient number of adequately trained staff. [During initial restart of the plant in ~2010, major modifications were inadequate to result in compliant operations; unknown whether after current layoffs preventative maintenance is occurring at the time of this writing.]
- Failure to establish or follow precautionary methods required by regulations or permits. [Failure to obtain Authority to Construct and Permit to Operate under Prevention of Significant Deterioration / SIP frameworks.]
- Removal of pollution equipment resulting in process, operational, or maintenance savings. [Lack of fuel storage and fly ash covers; main stack pollution control equipment at various times/combinations removed or not installed to result in compliance.]

Blue Lake Power has certainly had the unfair advantage of avoided direct costs (default on leases, utilities, permit fees), and avoided costs of environmental compliance. Blue Lake Power was fined $1,380,000 (one million, three hundred eighty thousand dollars) in a prior Settlement Agreement with the District. That penalty did not deter Blue Lake Power from further violations nor did it result in Blue Lake Power's fulfillment of the terms of that settlement – the District found that 2 years later, Blue Lake Power was still not in compliance with many of the terms of the Settlement Agreement.

The trivial $15,000 total civil penalty in the proposed Consent Decree will have absolutely no effect in accomplishing the intent of civil penalties: deterring Blue Lake Power from non-compliant operations. *Please see the discussion of Deterrence in the comments submitted by the Rapport & Marston, LLC.*

As of this writing, Blue Lake Power is ~9 months in arrears on its lease payments to the City of Blue Lake totaling over $85,000, and on its water and sewer payments totaling over $54,000, for a total of over $140,000 (source: City of Blue Lake City Manager email correspondence March 2016). And Blue Lake Power has defaulted on over $130,000 of utility bills that it owed to the City, but which the City agreed to settle for ~$30,000 (see BL Water Settlement attached). The initial funding provided by the Tribe to Blue Lake Power in 2009 allowed Blue Lake Power to settle its then amassed lease and utility debts to the City of Blue Lake, which already totaled $165,000 even at that time.

Blue Lake Power is also currently ~one (1) year behind on its Title V Permit Fees. According to Blue Lake Power's current Title V Permit, "Failure to pay these fees will result in forfeiture of this Permit to Operate," yet the District chose to enter into yet another settlement agreement to extend the timeline for Blue Lake Power to pay these fees). Further, Blue Lake Power is in default on their Greenhouse Gas Verification Fees. Together the Title V Permit Fees and the Greenhouse Gas Verification Fees total ~$30,000 in arrears.

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

Add all this up – and these are just the debts the Tribe is aware of – and it's a total of $270,000 in various required payments that are currently in default. Adding these Blue Lake Power debts to the $700,000 in estimated costs of achieving compliance, and Blue Lake Power would need ~$1 million in funding just to uphold its obligations in a few areas – and this figure does *not* include the funding Blue Lake Power needs for routine operations. At a minimum the proposed Consent Decree should be revised to include a bond from Blue Lake Power to cover all costs of compliance activities, (increased) penalties, and routine operations for a reasonable period of 'proof of performance,' so that in the event of any default, operational or financial, the public interest would be served with a substantial payment (see also comment letter from the U.S. Department of Interior).

**Blue Lake Power's Impact on Biomass Power Industry**
Blue Lake Power's demonstrated violations – and follow-on inability to uphold terms of its settlement agreements – exacerbated by allowing Blue Lake Power to resolve its current and chronic violations with a minimal penalty and paper compliance as outlined in the proposed Consent Decree, the reasonable and highly likely result will be Blue Lake Power's continued operation as a bad actor within a fragile industry.

In addition to Blue Lake Power's willful actions, the failure of the District and all related agencies to conduct reliable permitting, oversight, and enforcement of Blue Lake Power's violations and willful negligence has jeopardized the biomass power industry locally and nationally. It can reasonably be argued that Blue Lake Power – and its prominence as 'Exhibit A' in negative press about the pollution associated with biomass (see *Wall Street Journal* and *CleanTechnica* articles attached) – has directly impacted support for biomass power as "renewable" and resulted in reversal of policy and removal of incentives for biomass power.

It is the Tribe's position that where biomass power is operating in compliance with the Clean Air Act, individual Title V Permits and all other permits and regulations, biomass power has earned its place in policy definitions as "renewable energy," and is justified in its eligibility for funding support. This is especially true in the western U.S. where biomass power fits into the hazardous fuel reduction and waste diversion contexts, and particularly so in Humboldt County. However, support for biomass power is eroding due to bad actors such as Blue Lake Power and significant $CO_2$ and PM emissions, public concerns about decimating forests to feed these plants (which is frankly well-founded in many areas across the U.S. and the globe, though not in the western U.S.), and complicated lifecycle calculations of *net* GHG reductions and environmental benefits.

**Degree of Willfulness or Negligence**
The penalty in the proposed Consent Decree does not appear to take into account the Degree of Willfulness or Negligence factor within the "Clean Air Act Stationary Source Civil Penalty Policy."

Blue Lake Power had complete control over the events constituting the violation.

Blue Lake Power certainly could foresee the events constituting the violation (e.g., choosing not to apply for an Authority to Construct).

Blue Lake Power has certainly claimed a level of sophistication within the industry in its ability to deal with compliance issues and the accessibility of appropriate control technologies.

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

Blue Lake Power knew the legal requirements of the permitting regime at the time it purchased the plant, and the level of modification / reconstruction needed certainly met "major modification" definition, and compelled the ATC / PSD / SIP processes.

The Tribe views this as business-as-usual polluting without punishment, and the proposed Consent Decree as compliance on paper rather than actual compliance.

**Title V Permit**

Although a separate process from the Consent Decree, it is germane to the overall inadequate administrative and operational management of this plant by the District, other agencies, and by Blue Lake Power that to date it has taken over four (4) years to renew Blue Lake Power's Title V Permit, and the process is not complete, nor is it expected to be complete anytime soon. It does not seem reasonable (or regulatorily compliant) that this facility has been able to operate in limbo for over 4 years, especially when its initial Title V Permit was allegedly (but with overwhelming evidence) issued incorrectly (see Complaint).

Further, as noted above, it is the Tribe's position and recommendation that Blue Lake Power's Title V Permit should be forfeited, due to non-payment of Permit Fees.

There are other potential violations by Blue Lake Power of its Title V Permit that should be investigated, e.g., exceeding allowable propane quantities.

**Other Issues**

In addition to the issues detailed above and below, and in the attached documents, the Tribe submits the following as additional considerations:

Particulate matter – see letters "9.8.1989 Ultrapower Letter to Chairperson Daniels"

Lead – see "1996 March 13 Letter to EPA Ultrapower High Lead Emissions" attached.

Ammonia – Ammonia levels are called out specifically in the proposed Consent Decree, specifically the amount of unreacted ammonia contained in emissions from Blue Lake Power's main stack. Ammonia emissions have been an issue that clearly necessitates stricter controls.

Ash Runoff – see letter from California Fish and Wildlife, attached, which address willful water quality violations that have been documented.

Fuel Management Plans – in a 2011 Settlement Agreement (attached) between the District and Blue Lake Power, comprehensive fuel management activities were required. The current Consent Decree calls for similar activities, and the reasonable conclusion is a) Blue Lake Power has not complied with the terms of the 2011 settlement and b) there is zero confidence they will comply with the Consent Decree requirements for fuel management.

Additional Topics:

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

- Particulate matter / ash impacts to Endangered and Threatened Species in the Mad River.
- Arsenic, and other toxic emissions
- Thick, dark smoke releases from the power plant stack at random times, day and night
- Foul odors
- Heavy truck traffic that passes the Blue Lake Elementary School on the only route to/from Blue Lake Power
- Noise pollution in exceedence of its City of Blue Lake Conditional Use Permit and other requirements; excessive noises at all hours (including alarms over 1 mile away)
- Lighting pollution in exceedence of Blue Lake Power's permits with the City of Blue Lake.

Documentation on all these issues is available upon request.

**Monitoring and Testing**
As noted above and in meetings with the District, and EPA, the Tribe seeks comprehensive monitoring of all emissions, with a focus on particulate matter, directly measuring quantity and constituency of particulates in real time -- at the main stack, at the fuel storage area, at any other sources of emissions, at the Blue Lake Power site boundaries, and at multiple sites that address impacted areas at the Rancheria.

In the Tribe's past efforts to work with the District to request more monitoring and determine monitoring protocols and activities, a tribal staff person spoke with the District's permitting contact. When the District representative was asked by the tribal staff member about what types of monitoring occur regarding particulate matter volume and composition, he said 'they have gather data on "opacity" every 6 minutes from a monitor on the Blue Lake Power stack,' and when the tribal staff member asked what opacity tells them about particulate matter he said, "there is a **loose correlation** between opacity and particulates." (**Bold** emphasis added.) Obviously if opacity is being used to quantify particulate emissions, a "loose correlation" is not an acceptable degree of accuracy or measurement standard, and the Tribe requests best available control technologies (BACTS), and Continuous Emission Monitoring Systems, and any other instrumentation that ensures accurate accounting for particulate matter emissions be installed prior to any restart of Blue Lake Power.

Further, in order for the monitoring and its resulting data to be used as a verified source in reporting, compliance, and enforcement actions, the Tribe recommends this monitoring be implemented as joint monitoring stations in partnership with the District and the EPA, paid for by Blue Lake Power, and which would meet all requirements of all regulations and processes relating to monitoring (e.g., California Air Resources Board Primary Quality Assurance Organization). The Tribe's Environmental Programs Department has been conducting Air Quality Monitoring for over a decade, and has experience in accurate data collection, instrumentation, reporting, etc.

Regarding testing of particulate matter fallout, at various times (please see as examples, Blue Lake Rancheria Particulate Tape Sampling Event, and Particulate Blue Awning Event documents attached) tribal staff have collected samples of particulate matter from various sites on the Tribe's trust land. Though these samples were dutifully and accurately collected, it was not done by an independent objective third party. Further, as noted above, the District has stated to the Tribe it is "certain the plant was not the cause" of the sooty fallout, thus the Tribe was hesitant to rely on the District's oversight and processing of any testing protocols, given this bias.

# BLUE LAKE RANCHERIA

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

**Undue Burdens of Reporting; Inadequate Permitting, Oversight, Regulation, and Enforcement**
The Blue Lake Rancheria is a small tribe, and the City of Blue Lake is a small town, and the biomass plant currently owned/operated by Blue Lake Power is a large, chronic problem.

The District and the EPA have counseled the Tribe (up to and including the March 23rd meeting) to report any infractions that the Tribe observes regarding Blue Lake Power so that 'they can investigate.' On its face this places an undue burden on the Tribe and local citizens to achieve inspection and enforcement activities. It is not the Tribe's job to inspect Blue Lake Power for CAA or any other violations. It is the job of the regulatory structure and agencies to ensure adequate monitoring and compliance activities in place to result in compliance.

However, the Tribe, tribal staff, tribal members, other Rancheria residents, residents of the City of Blue Lake, county residents affected by Blue Lake Power emissions – hundreds of people have lodged and reported thousands of complaints about Blue Lake Power emissions and other issues to the Tribe, to the City of Blue Lake, to the District, and to the California and federal EPA. Reporting, documenting, and submitting complaints takes valuable time – time ordinary citizens and tribal staff (who are not experts in utility-scale biomass power plant permitting / compliance / enforcement) need to spend on their full-time jobs and family, health, and education obligations.

Further, the Tribe and these hundreds of people have had to spend time fighting a dismissive District and unresponsive regulatory agencies, simply to obtain compliance and enforcement of the legal and regulatory processes that should have been applied and enforced – all while enduring the impacts of a bad actor entity that evidently has mastered how to operate in outright defiance of the permitting and regulatory requirements.

There is an overall environmental justice concern as well, as the Tribe is located between wastewater treatment plant owned by the City of Blue Lake, a defunct landfill with questionable capping and other environmental protections, and this biomass plant.

As detailed above, the Tribe has met and corresponded with the District, California Environmental Protection Agency, U.S. Environmental Protection Agency, and the Department of Justice, among other stakeholders. Either the agencies have not responded, not responded timely, and/or the meetings have been unproductive. Partially this is due to the complex permitting, enforcement, and other divisions of responsibilities across many agencies and personnel, but even given that understanding, the lack of any response, delayed response times, and lack of trust responsibility have been unacceptable. Through correspondence, government-to-government consultation, and other mechanisms, the Tribe considers any administrative remedies to be exhausted.

Everyone is time and resource constrained, but we rely on our regulatory agencies to do their jobs and implement and enforce the laws and regulations.

There is a specific conflict of interest issue with the Consent Decree. Nancy Diamond represents both the City of Blue Lake and the District, and as a result has several conflicting interests. Blue Lake Power owes the City of Blue Lake hundreds of thousands of dollars in lease and utility payments. On the one hand, while the District may seek greater penalties on Blue Lake Power for Clean Air Act violations, the City of Blue Lake has an interest in limiting any penalties to allow Blue Lake Power to pay back debts to the City of Blue Lake. The conflict of interest with Nancy Diamond also

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov

runs the opposite way. She is representing the District, which had a role and responsibility (and potential liability) in the original inadequate permitting structure, so she would want this Consent Decree to be approved to protect the District. In that sense, it would be advantageous to discourage the City of Blue Lake (and/or its citizens) from opposing the Consent Decree (even though there have been hundreds of complaints from Blue Lake residents) in order to protect the District and this deal. In fact, in a City Council meeting in March, Ms. Diamond was asked what the process was with the consent decree, and she said 'most of the time they are accepted by the Court' which may be true, but when Ms. Diamond, the City Attorney, makes that statement it likely also has the effect of discouraging Blue Lake residents from thinking they can change the outcome with comments or other actions.

The District (and the related agencies) and the City of Blue Lake have repeatedly negotiated and settled with Blue Lake Power on all of their critically serious issues to no net improvement in terms of compliance, and to significant financial loss. This documented track record leads the Tribe to conclude that the District, California EPA, and the U.S. EPA cannot be relied upon to regulate this facility, and as such, urges the proposed Consent Decree to be withdrawn and for the United States to proceed with litigation.

**Conclusions**

Given the facts listed above, the Tribe fails to see how Blue Lake Power can be considered financially or operationally able to operate in compliance. This plant was constructed 30 years ago, with an 11-year interim period of de facto abandonment. It is the Tribe's position that Blue Lake Power's repeated, chronic failure to achieve compliant operations demonstrates that the plant is simply not (or no longer) able to achieve a compliant operational standard.

Given it's track record with financial default and regulatory violations, the Tribe also fails to see how the United States and EPA could reasonably conclude that Blue Lake Power can fulfill the even the relatively lax terms of the proposed Consent Decree, and the Tribe has zero confidence that Blue Lake Power can achieve *actual* compliance with the Clean Air Act and other regulations.

The Tribe respectfully recommends the following:

* **Withdraw the proposed Consent Decree**
* **Proceed with litigation based on the Complaint.**
* **Require Blue Lake Power to demonstrate its operational and financial ability to comply with all regulations before a restart is allowed under any circumstances.**
* **Require Blue Lake Power to apply for a new Authority to Construct/Permit to Operate, in compliance with all Prevention of Significant Deterioration and State Implementation Plan framework requirements.**
* **Require independently verifiable proof of Blue Lake Power's financial capability to implement, and its technological capability to operate in compliance.**
* **New requirements for comprehensive monitoring of all emissions, with a focus on particulate matter, directly measuring quantity and constituency of particulates in real time.**
  * The Tribe recommends a joint monitoring station in partnership with the District and EPA, paid for by Blue Lake Power, and which would meet all the requirements of all regulations and processes relating to monitoring, data collection, and reporting so that there is complete confidence in the data by all parties and in compliance and enforcement contexts.

**BLUE LAKE RANCHERIA**

P.O. Box 428
Blue Lake, CA 95525

Office: (707) 668-5101
Fax: (707) 668-4272

www.bluelakerancheria-nsn.gov



- **Any future violation of Blue Lake Power's permits or settlements should be enforced immediately with the maximum penalties.**

Or, at a minimum,

- Modify the Consent Decree to include larger penalties and far more stringent compliance activities
- Require Blue Lake Power to demonstrate its operational and financial ability to comply with all penalties, compliance activities, and regulations <u>before a restart is allowed under any circumstances.</u>
- Require a bond from Blue Lake Power for the full value of all compliance activities, penalties, and 3 years of routine operations.

The Tribe has made every attempt to be a good neighbor and support biomass power – both this plant in particular and the biomass power industry in general – to support jobs and relatively green energy production. In the case of Blue Lake Power however, the health and environmental impacts have become untenable.

Thank you for your consideration in this important matter.

Sincerely,

Arla Ramsey
Vice Chairperson

Cc:     Blue Lake Rancheria Tribal Council
        U.S. Department of Interior
        Dave Rapport, Rapport and Marston

Attachments:

- 11.19.1983 BLR Letter to Ultrapower
- 9.8.1989 Ultrapower Letter to Chairperson Daniels
- 2009 Times Standard Article Blue Lake Extends Blue Lake Power Agreement
- 2011 BLP_NCUAQMD Settlement Agreement
- 2011 July 8 CA Fish & Game Letter Blue Lake Power Ash
- BL Power Water Settlement
- BLR Letter to NCUAQMD 7.2.13 Low Res
- Blue Lake Rancheria Particulate Tape Sampling Event Low Res
- Blue Lake Rancheria Particulate Blue Awning Event
- CAA Facilities EPA Watch List 9.2011
- BLR Letter to NCUAQMD 7.2.13 Low Res
- CleanTechnica Blue Lake Power Article
- Wall Street Journal Article 'Green' Wood-fired Power Plants Generate Pollution Violations
- Sample Correspondence notes with North Coast Unified Air Quality Management District

# EXHIBIT C

Law Offices Of

**RAPPORT AND MARSTON**

*An Association of Sole Practitioners*

405 W. Perkins Street
Ukiah, California 95482

David J. Rapport                                                        Phone (707) 462-6846
Lester J. Marston                                                     Facsimile (707) 462-4235
Scott Johnson
Mary Jane Sheppard
Darcy C. Vaughn

April 4, 2016

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED
& EMAIL**

John C. Cruden
Assistant Attorney General
U.S. Department of Justice—ENRD
P.O. Box 7611
Washington, DC 20044-7611
Email: pubcomment-ees.enrd@usdoj.gov

> RE:    Comments of the Blue Lake Rancheria on the U.S. Environmental Protection
> Agency and Department of Justice's Proposed Consent Decree with Blue Lake
> Power, *USA & NCUAQMD v. Blue Lake Power LLC*, United States District Court
> for the Northern District of California, Case No. 3:16-cv-00961, D.J. Ref. No. 90-
> 5-2-1-11038; 81 FR 11591, Page 11591-11592, Document #2016-04721

Dear Assistant Attorney General Cruden:

Our law office is general counsel to the Blue Lake Rancheria ("Tribe"), a federally recognized
Indian tribe, located in Humboldt County, California. The Tribe's reservation sits immediately
adjacent to Blue Lake Power, the defendant in the above-entitled case, which entity has caused
significant harm to the healthy environment previously enjoyed by the Tribe. The purpose of this
correspondence is to, on behalf of the Tribe, submit comments on the proposed consent decree
("Consent Decree") lodged with the United States District Court for the Northern District of
California in the above-entitled case.

The Environmental Protection Agency ("EPA") should rescind the Consent Decree, or the
district court should refuse to approve it, on the grounds that it is unfair, inadequate,
unreasonable, and not in the public interest, because, *inter alia*: (1) the penalties assessed to Blue
Lake Power are inadequate, unreasonable, and fail to conform with the EPA's "Clean Air Act
Stationary Source Civil Penalty Policy" and the "Penalty Policy for Violations of Certain Clean
Air Act Permit Requirements for the Construction or Modification of Major Stationary Sources

April 4, 2016                                                                                      Page 2
RE: Comments of the Blue Lake Rancheria on the U.S. Environmental Protection Agency's
Proposed Consent Decree with Blue Lake Power, *USA & NCUAQMD v. Blue Lake Power
LLC*, United States District Court for the Northern District of California, Case No. 3:16-cv-
00961; 81 FR 11591, Page 11591-11592, Document #2016-04721

---

of Air Pollution;" (2) the EPA, in negotiating the Consent Decree, has failed to adequately
perform its trust responsibilities owed to the Tribe; (3) the protocols for particulate matter testing
are inadequate; (4) all of the timelines provided for in the Consent Decree are too lenient; and (5)
the Consent Decree should, but does not, provide for enhanced opacity limitations.

> **1.     The Penalties Assessed to Blue Lake Power are Inadequate and
> Unreasonable and Fail to Conform to EPA Penalty Policies**.

The Consent Decree assesses a civil penalty of $5,000 against Blue Lake Power for its violations
of the Clean Air Act, 42 U.S.C. § 7401, *et seq*. This amount is unreasonably low when
considering Blue Lake Power's protracted history of Clean Air Act violations and it is far below
the minimum settlement figure that results from application of EPA penalty policies.

The EPA's "Penalty Policy for Violations of Certain Clean Air Act Permit Requirements for the
Construction or Modification of Major Stationary Sources of Air Pollution" ("Permit Penalty
Policy") applies to permit-related violations of the Clean Air Act and provides a "**minimum
settlement amount** for such violations." Permit Penalty Policy, p. 1 (emphasis added). The
Permit Penalty Policy is to be used in cases, like the present case, related to the construction or
modification of major stationary sources under the prevention of significant deterioration
program. *Id*. Penalties assessed under the Permit Penalty Policy are to be **added** to any penalties
assessed under the "Clean Air Act Stationary Source Civil Penalty Policy" ("General Penalty
Policy"). Importantly, the Permit Penalty Policy appears to have been last revised in 1987 and
the monetary penalties outlined therein are calculated in 1987-dollars.

Where a major stationary source is alleged to have failed to comply with the authority to
construct and prevention of significant deterioration permitting requirements, the gravity
component of the penalty is to be calculated pursuant to the Permit Penalty Policy Matrix
Minimum Settlement Figures:

PERMIT PENALTY POLICY MATRIX
MINIMUM SETTLEMENT FIGURES
(per month of violation)

| TOTAL COST OF AIR POLLUTON CONTROL FOR NEW OR MODIFIED SOURCE ($ THOUSANDS) | PSD SOURCES CONSTRUCTION OR OPERATION WITHOUT A PERMIT OR IN VIOLATION OF A VALID PERMIT | INCREMENT EXCEEDED |
|---|---|---|
| less than 50 | $  2,000 | $ 7,000 |
| 50-150 | 4,000 | 11,000 |
| 150-500 | 7,000 | 16,000 |
| 500-1,500 | 11,000 | 18,000 |
| 1,500-5,000 | 16,000 | 21,000 |
| 5,000-15,000 | 22,000 | 25,000 |
| 15,000-50,000 | 29,000 | 31,000 |
| over 50,000 | 37,000 | 39,000 |

April 4, 2016                                                                                                   Page 3
RE: Comments of the Blue Lake Rancheria on the U.S. Environmental Protection Agency's Proposed Consent Decree with Blue Lake Power, *USA & NCUAQMD v. Blue Lake Power LLC*, United States District Court for the Northern District of California, Case No. 3:16-cv-00961; 81 FR 11591, Page 11591-11592, Document #2016-04721

---

Permit Penalty Policy, p. 5.

The matrix also provides for the assessment of an additional penalty for certain specified violations of substantive permit preconditions or requirements. The appropriate dollar value for a violation is dependent upon the estimate of the total cost of air pollution control at facilities of the source for which the permit was required. This value is then multiplied by the number of months during which the source operated in violation. Where there are multiple permit-related violations, a penalty figure is calculated for each violation and the individual penalty figures are added together to produce one minimum settlement figure. The economic benefit component and the gravity component of the penalty are added together to determine the preliminary deterrence amount. This initial amount can then be adjusted using the General Penalty Policy factors, which take into account individual equitable considerations. Significantly, to settle a case for less than the minimum penalty amount prescribed by the matrix because of litigation practicalities, the litigation team must receive special approval of the settlement by the Associate Enforcement Counsel for Air. Permit Penalty Policy, p. 4.

The EPA stated, at a March 23, 2016 meeting with the Tribe, that the total cost of air pollution control, which Blue Lake Power avoided by not acquiring authority to construct and prevention of significant deterioration permits, was approximately $700,000. Based on the matrix, the minimum settlement figure, therefore, should be calculated at a rate of $11,000 per month of construction and operation without each permit. Blue Lake Power's major modifications to the plant occurred from January of 2008 until initial operation of the plant in December of 2009, a 24-month period. Blue Lake Power operated the plant from December of 2009 until May of 2015, a 65-month period. Thus, the minimum penalty assessed to Blue Lake Power, based on the matrix, should be $264,000 for major modification of the plant without an authority to construct permit (24 months × $11,000), and $715,000 for operation of the plant without prevention of significant deterioration permitting (65 months × $11,000). The sum of these two figures yields a **minimum** penalty of $979,000—in 1987-dollars. The $5,000 penalty the EPA is currently seeking from Blue Lake Power is a mere 0.5% of the minimum penalty generated by application of the Permit Penalty Policy matrix. This is beyond the limits of acceptability or fairness and flies in the face of the agency's adopted penalty policy for determining permitting-related penalties.[1]

The Tribe understands that, under certain circumstances, the EPA must adjust penalties in light of a source's inability to pay. The General Penalty Policy, however, states, with specificity, that,

---

[1] It is worth noting that Nancy Diamond, the attorney representing the District in the federal court litigation, could have a potential conflict of interest in this case, as she also represents the City of Blue Lake, which is owed hundreds of thousands of dollars in lease payments from Blue Lake Power. While the District has an interest in imposition of enhanced penalties on Blue Lake Power for Clean Air Act violations, the City of Blue Lake has an interest in limiting any penalties to allow Blue Lake Power to pay back debts to the City of Blue Lake.

April 4, 2016                                                                                         Page 4
RE: Comments of the Blue Lake Rancheria on the U.S. Environmental Protection Agency's
Proposed Consent Decree with Blue Lake Power, *USA & NCUAQMD v. Blue Lake Power
LLC*, United States District Court for the Northern District of California, Case No. 3:16-cv-
00961; 81 FR 11591, Page 11591-11592, Document #2016-04721

---

while the "EPA should consider the ability to pay a penalty in adjusting the preliminary
deterrence amount, ... it is important that the regulated community not see the violation of
environmental requirements as a way of aiding a financially-troubled business." General Penalty
Policy, p. 20. In fact, the General Penalty Policy expressly reserves the EPA's right to seek "a
penalty that might contribute to a company going out of business." *Id*. Alternatively, the EPA has
the option to consider a delayed payment schedule, with interest, should the EPA determine that
a violator cannot afford the penalty prescribed by the policies. *Id*. at 21.

The EPA's decision to seek a $5,000 penalty in this case, justified by an inability to pay, is
unreasonable. It does not provide any deterrent effect; it does not truly account for the economic
benefit reaped by Blue Lake Power by violating the Clean Air Act; it does not comply with the
EPA's Permit Penalty Policy and General Penalty Policy; and it does not take into account the
fact that Blue Lake Power continued operation of the plant during periods in which it knew that
it was in violation of the Clean Air Act. What the $5,000 penalty does do is reward Blue Lake
Power for financial irresponsibility and encourage further violations of the Clean Air Act. For
these reasons, the EPA should renegotiate a consent decree with an increased penalty against
Blue Lake Power or it should, at the very least, increase the penalty with a delayed payment
schedule.

> **2.    The EPA, in Negotiating the Consent Decree, Has Failed to Adequately
> Perform Its Trust Responsibilities Owed to the Tribe**.

The United States maintains a trust relationship with all federally recognized Indian tribes.
*Seminole Nation v. United States,* 316 U.S. 286, 296-297 (1942). "This principal has long
dominated the Government's dealings with Indians." *United States v. Mitchell*, 463 U.S. 206,
225 (1983). The existence of a trust responsibility toward Indians exists independent of the
express provisions of a treaty, agreement, executive order, or statute. *Navajo Tribe of Indians v.
United States*, 624 F.2d 981, 991 (Ct. Cl. 1980). In the exercise of the trust responsibility towards
Indian tribes, the federal government's conduct must be exercised with "great care." *United
States v. Mason*, 412 U.S. 391, 398 (1973).

> [T]his Court has recognized the distinctive obligation of trust incumbent upon the
> Government in its dealings with these dependent and sometimes exploited people
> .... Under a humane and self imposed policy which has found expression in many
> acts of Congress and numerous decisions of this Court, it has charged itself with
> moral obligations of the highest responsibility and trust. Its conduct, as disclosed
> in the acts of those who represent it in dealings with the Indians, should therefore
> be judged by the most exacting fiduciary standards.

*Seminole Nation v. United States*, 316 U.S. at 296-297.

April 4, 2016                                                                                      **Page 5**
**RE: Comments of the Blue Lake Rancheria on the U.S. Environmental Protection Agency's**
**Proposed Consent Decree with Blue Lake Power,** *USA & NCUAQMD v. Blue Lake Power*
*LLC,* **United States District Court for the Northern District of California, Case No. 3:16-cv-**
**00961; 81 FR 11591, Page 11591-11592, Document #2016-04721**

---

In carrying out its trust obligations to Indian people, the United States must exercise a common law duty of care similar to that of a private trustee or fiduciary in managing a private trust. *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2325 (2011).

Under the general trust responsibility, the federal government is required to consult with, and consider, the interests of Indian tribes when engaged in any activity that may affect them. All federal agencies, including the EPA, share in that trust responsibility. Thus, all of the EPA's actions with respect to Blue Lake Power must be viewed through the lens of this trust responsibility.

The EPA "Policy for the Administration of Environmental Programs on Indian Reservations" ("Indian Policy") specifically states that the EPA, "in keeping with the federal trust responsibility, will assure that tribal concerns and interests are considered whenever EPA's actions and/or decisions may affect reservation environments." Indian Policy, p. 3. The Indian Policy goes on to state that, in keeping with the historical relationship between the federal government and Indian tribes, the EPA "will endeavor to protect the environmental interests of Indian Tribes when carrying out its responsibilities that may affect the reservations." *Id*.

Executive Order 12898, 59 Fed. Reg. 7629 (Feb. 16, 1994), moreover, requires that the EPA:

> To the greatest extent practicable and permitted by law, … make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions….

The EPA's "Policy on Environmental Justice for Working with Federally Recognized Tribes and Indigenous Peoples" also states that the EPA must provide:

> …early meaningful involvement opportunities for federally recognized tribes, indigenous peoples, and others living in Indian country, at all stages of Agency activity, including the development of public participation activities, the administrative review process, and any analysis conducted to evaluate environmental justice issues.

During the course of negotiations between Blue Lake Power and the EPA that resulted in the proposed Consent Decree, the EPA made no effort to consult with the Tribe to ensure meaningful and timely input by tribal officials. The Tribe and the EPA met in September of 2015 regarding Blue Lake Power and the Tribe provided information to the EPA regarding the plant. No substantive details were provided to the Tribe regarding the negotiations and, despite the

April 4, 2016                                                                                    Page 6
RE: Comments of the Blue Lake Rancheria on the U.S. Environmental Protection Agency's
Proposed Consent Decree with Blue Lake Power, *USA & NCUAQMD v. Blue Lake Power
LLC*, United States District Court for the Northern District of California, Case No. 3:16-cv-
00961; 81 FR 11591, Page 11591-11592, Document #2016-04721

---

Tribe's request for communication, the Tribe has had to initiate all subsequent information
gathering. The Tribe is displeased that the EPA apparently did not consider tribal interests at the
time when the material terms of the Consent Decree, which directly affect the Tribe's Indian
country, were agreed upon. Rather, the EPA met with the Tribe regarding the terms of the
Consent Decree only **after** the Consent Decree was finalized and lodged with the district court.
This had the effect of preventing the Tribe from pursuing certain legal remedies of its own. At
the meeting held between the EPA and the Tribe on March 23, 2016, the EPA stated that the
terms of the Consent Decree would not now be amended based on consultation with the Tribe.
The only alternative to approval of the Consent Decree would be rescinding the decree in its
entirety. This is not the meaningful consideration required by the trust responsibility imposed on
the EPA by federal law. And it does not meet the standards set forth in Executive Order 12898.
The Tribe must be included in the negotiation of the terms of the Consent Decree because those
terms directly affect the Tribe's reservation, its environment, and the health and welfare of the
reservation populace.

### 3.      The Protocols for Particulate Matter Testing are Inadequate.

The Consent Decree, as currently formulated, requires Blue Lake Power to conduct a stack test
on the main stack to determine compliance with $PM_{10}$ emission rates established by the Consent
Decree no later than 18 months following EPA's approval of the boiler engineering study report.
After the initial stack test, the Consent Decree requires that Blue Lake Power perform only one
stack test per year. Both the timeline for the initial stack test and the periodicity of later testing
are unreasonable as proposed.

The Consent Decree allows Blue Lake Power 15 days to prepare a boiler engineering protocol
and 90 days to complete the boiler engineering study report. Thus, under the proposed language
in the Consent Decree, Blue Lake Power is permitted to operate the plant for 22 months—nearly
two years—before it is required to test the main stack for particulate matter emissions. Even if
the EPA were to ignore the numerous PM emissions violations that occurred between 2010 and
2014, allowing operation for almost two years without a single PM stack test is, on its face,
unreasonable. Considering the two-year period without a stack test in light of Blue Lake Power's
previous violations, it is patently absurd. This timeline must be amended.

With regard to the frequency of stack testing after the initial test, a single test per year is not
sufficient to ensure that Blue Lake Power operates in compliance with the emissions limitations
imposed by the Consent Decree. Blue Lake Power's previous conduct indicates the great lengths
to which it will go to ensure that operation during the stack testing occurs under ideal conditions
designed to produce unrealistically low emissions data. More frequent stack testing will restrict
Blue Lake Power's ability to create emissions reports that may not accurately reflect emissions
during typical operation. Additionally, based on Blue Lake Power's demonstrated inability to

April 4, 2016                                                                                                                    Page 7
**RE: Comments of the Blue Lake Rancheria on the U.S. Environmental Protection Agency's Proposed Consent Decree with Blue Lake Power,** *USA & NCUAQMD v. Blue Lake Power LLC***,** United States District Court for the Northern District of California, Case No. 3:16-cv-00961; 81 FR 11591, Page 11591-11592, Document #2016-04721

---

comply with its previous—less restrictive—emissions limitations, stack tests must be conducted more frequently than the Consent Decree currently requires.

### 4.    All of the Timelines Provided for in the Consent Decree Are Too Lenient.

The Consent Decree permits Blue Lake Power to resume operation of the plant the day the district court approves the agreement. Yet, none of the studies, reports, and emissions control technologies are required to be in place prior to resuming operations. For example, Blue Lake Power has 12 months, after approval of the boiler engineering study report, to install and continuously operate the improved selective non-catalytic reduction control device and the over-fire air gas conveyance system. Similarly, Blue Lake Power has three months during which to submit to the EPA a plan for the electrostatic precipitator currently in use on the main stack to control particulate matter emissions from the broiler. These and other timelines in the Consent Decree are not sufficient to ensure that, when Blue Lake Power resumes operation, it complies with all emissions limitations. The time periods within which Blue Lake Power has to complete the milestones in the Consent Decree should be shortened to limit operation of the plant in the absence of important enhanced control technologies and reporting requirements.

### 5.    The Consent Decree Should Provide for Enhanced Opacity Limitations.

While the complaint in this case does not address opacity issues, the Consent Decree should nevertheless set forth enhanced opacity regulations to ensure that Blue Lake Power operates in conformity with all applicable opacity limitations. Blue Lake Power has a history of repeated opacity violations of which the North Coast Unified Air Quality Management District and the EPA are aware. The failure to address this issue in the Consent Decree and the complaint should be corrected to require Blue Lake Power to submit to the EPA an opacity optimization plan that analyzes and recommends operating parameters designed to ensure that opacity is optimized at all times, including start-up and shut down.

If you have any questions about this matter, please contact us at the telephone number or address listed on the above letterhead.

Yours Very Truly,

_/s/Cooper M. DeMarse_____
DAVID J. RAPPORT
COOPER M. DEMARSE
Attorneys for the Blue Lake Rancheria

# EXHIBIT D



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way
Sacramento, California 95825

IN REPLY REFER TO.

APR 4 – 2016

Assistant Attorney General
United States DOJ-ENRD
P.O. Box 7611
Washington, DC 20044-7611

RE: *United States and North Coast Unified Air Quality Management District v. Blue Lake Power LLC, D.J. Ref. No. 90-5-2-1-11038*

The Bureau of Indian Affairs (BIA), Pacific Regional Office respectfully submits our comments to the Consent Decree named above. Our Agency holds a trust responsibility to protect and preserve tribal lands, assets, and resources in perpetuity for federally-recognized tribal nations. In light of that responsibility, we were concerned to learn of the Blue Lake Rancheria's (the Tribe) nuisance, public health, and environmental concerns with the biomass powerplant currently owned by Blue Lake Power, LLC. Specifically, there appears to be a history of Clean Air Act violations and operational issues that have resulted in high levels of particulate matter and ash deposition on Tribal lands. Impacts to the environment on Tribal lands have apparently been documented by the Tribe and admitted by the operator of the biomass plant in the past. We ask that you consider the Tribe's public health and environmental concerns carefully prior to moving forward with this Consent Decree.

We support the concept of the Consent Decree. We recognize the Consent Decree seeks to 1) preserve a facility that contributes to the value of biomass generated renewal energy and 2) move the facility into full compliance with the Clean Air Act. However, we also recognize the Consent Decree's acknowledgement of the facility's limited ability to pay an appropriate amount in civil penalties. Therefore, we question whether Blue Lake Power has the financial capacity to comply and remain in compliance with the Clean Air Act after restarting the plant. With this in mind, Blue Lake Power, LLC should be required to comply with all regulations and requirements listed in the Consent Decree before restart is allowed. The issuance of a new Authority to Construct/Permit to Operate would be a meaningful approach that fulfills all Prevention of Significant Deterioration framework requirements.

In the alternative, if the plant is allowed to restart before compliance with pollution prevention technologies, a bond should be required in the full amount of the applicable fines for non-

compliance. This requirement allows Blue Lake to move forward with a greater incentive to remain in full compliance.

Finally, the civil penalties and environmental mitigation seem de minimus compared to the public health and environmental consequences of community members living near the Blue Lake Power facility. The Environmental Protection Agency has the ability to levy civil penalties up to $37,500 per day for violations of the Clean Air Act. The District has the ability to levy civil penalties ranging from $1,000 to $75,000 per day per violation. The Consent Decree assesses a mere $5,000 civil penalty. Presumably a civil penalty is designed both to punish for past violations and deter future violations. Surely a $5,000 penalty will accomplish neither goal. We would ask that the assessment of the civil penalty be reconsidered. Also, the Consent Decree's sole environmental mitigation measure is a $10,000 contribution to the District's Wood Stove Incentive Replacement Program. While we're sure this is an effective program to reduce particulate matter pollution generally within the District, we are concerned with the minimal amount of the contribution required. We are also concerned that this mitigation measure does not focus at all on the environmental and health effects that the Tribe alleges have occurred adjacent to the biomass plant on Tribal lands. The Wood Stove Incentive Replacement Program is effective for wood stoves throughout Humboldt, Trinity, and Del Norte Counties. Certainly the replacement of a few wood stoves in places as distant as Crescent City (60 miles north of Blue Lake on the coast) or Weaverville (55 miles east of Blue Lake over the coast range) will have little to no effect to mitigate past or potential future health/environmental effects on Tribal lands and in the immediate Blue Lake area.

We thank you for your time in carefully reviewing this comment letter. Should you have any questions or would like to discuss, please contact John Rydzik, Chief, Division of Environmental, Cultural Resource Management and Safety at (916) 978-6051.

Sincerely,

*Ken Ben*

Regional Director    Acting