UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>　　　　　Plaintiffs,<br>BLUE LAKE RANCHERIA TRIBE,<br>　　　　　Plaintiff-Intervenor,<br>　　v.<br>BLUE LAKE POWER, LLC,<br>　　　　　Defendant. | Case No. 16-cv-00961-JD<br><br>**ORDER RE MOTION TO ENTER CONSENT DECREE**<br><br>Re: Dkt. No. 46 |

  This is a civil environmental enforcement action brought by the United States and the North Coast Unified Air Quality Management District ("District") against Defendant Blue Lake Power, LLC ("Blue Lake") under the Clean Air Act ("CAA"). The United States, the District and Blue Lake are parties to a proposed consent decree for Blue Lake's biomass-fueled electric generating facility in Northern California (the "Facility"). The parties have revised the proposed decree and now ask the Court to approve it. Dkt. No. 46. The Facility is close to land belonging to the Blue Lake Rancheria Tribe ("Tribe"). The Court granted the Tribe's motion to intervene under the CAA, and the Tribe opposes the consent decree. The motion is granted and the decree is approved.

  Before getting to the merits, the Court notes that the filings in the case have apprised it of the long and contentious dealings between the Tribe and Blue Lake over the location and operation of the Facility. For reasons that appear to be rooted in that rancorous history, the Tribe has pressed for consideration of issues that are directed much more to whether the Facility should be allowed to operate at all or be located so close to tribal land, rather than those within the scope of the CAA claim. Blue Lake has replied in kind in support of the plant.

As the Court has emphasized on several occasions, this is not the place for a referendum on the Facility. The proposed consent decree is directed solely at resolving the United States' and the District's civil claims against Blue Lake for alleged CAA violations for three pollutants: $NO_x$ (oxides of nitrogen), CO (carbon monoxide) and $PM_{10}$ (particulates of less than 10 microns in diameter). The Tribe is advised again, as the Court has said before, that it is perfectly free to pursue its many other concerns about the Facility that are outside the CAA -- such as unwanted noise, light, odors, lead, arsenic, truck traffic or any other perceived nuisances -- in an appropriate court or non-judicial forum.

## BACKGROUND

This Facility is a biomass-fired, wood-burning electric generating plant located in Blue Lake, Humboldt County, California. Dkt. No. 1 ¶¶ 1, 22. It was built in 1984 and began commercial operations in 1987, but was idled between 1999 and 2008 for various reasons. *Id*. ¶¶ 64, 72-74. Blue Lake Power, LLC became the owner and operator of the Facility in 2008. *Id*. ¶¶ 75-76.

This case arises out of the work Blue Lake undertook between 2008 and 2010 before firing up the Facility again. Blue Lake is alleged to have spent over $6 million at that time "on the boiler island, electrical substation, fuel conveying system, turbine, emissions control devices, and other equipment." *Id*. ¶ 77. The complaint alleges that that work, and the Facility's subsequent restart in 2010, "constituted 'construction' as defined in 42 U.S.C. § 7479 and 'modifications' as defined in 42 U.S.C. § 7411(a) and District PSD Rule 130(m)(2)." *Id*. ¶¶ 79-80. Plaintiffs, the government enforcement agencies, allege Blue Lake should have obtained a preconstruction permit before doing the refitting work, which it did not do. *Id*. ¶¶ 85-91. The complaint alleges that Blue Lake violated the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., California state law, and the federally-approved District regulations that were incorporated into the California State Implementation Plan ("SIP"). *Id*. ¶ 1. The complaint requests civil penalties and injunctive relief requiring Blue Lake to "implement remedial measures" and to "mitigate excess emissions that have resulted from Defendant's non-compliance." *Id*. ¶ 2.

According to the complaint, operations at the Facility stopped again in May 2015.  *Id*. ¶ 14. Counsel for the United States stated at the motion hearing that the Facility had been restarted on December 14, 2016, but represented that the consent decree obligations were binding on Blue Lake even while court approval was pending.  Dkt. No. 105 at 56:5-57:1.

## I. STATUTORY BACKGROUND

The statutory and regulatory background here is complex.  The Court detailed it in a prior order, Dkt. No. 51, and will focus on the relevant highlights here.  The Clean Air Act was enacted to protect and enhance the quality of the nation's air to promote public health and welfare.  42 U.S.C. § 7401(b)(1).  In 1970, Congress amended the CAA to "guarantee the prompt attainment and maintenance of specified air quality standards." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 469 (2004) (internal quotations omitted).  To that end, the amendments required the Environmental Protection Agency ("EPA") to promulgate and publish national ambient air quality standards ("NAAQS") for air pollutants that may cause or contribute to air pollution reasonably anticipated to endanger public health or welfare.  42 U.S.C. §§ 7408(a), 7409(a), (b).

The "Prevention of Significant Deterioration of Air Quality" ("PSD") program was added to the CAA by amendments made in 1977, and the purpose of the program was "to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade." *Alaska*, 540 U.S. at 470 (citations omitted); *see also* 42 U.S.C. §§ 7470-92.  Under the PSD program, no "major emitting facility" may be constructed or modified without obtaining a permit setting forth emissions limitations and utilizing the "best available control technology" ("BACT") for each pollutant subject to regulation that will be emitted from the facility.  42 U.S.C. §§ 7475(a)(1),(4).

The CAA "has established a uniquely important system of cooperative federalism in the quest for clean air," and it "makes the States and the Federal Government partners in the struggle against air pollution." *Comm. for a Better Arvin v. U.S. E.P.A.*, 786 F.3d 1169, 1173 (9th Cir. 2015) (internal quotations omitted).  Here, the PSD permitting rules Blue Lake is alleged to have violated largely originated with the District and were made a part of California's federally-enforceable State Implementation Plan ("SIP").  *See* Dkt. No. 1 ¶¶ 31-48.  The complaint explains

that those rules in turn reference and incorporate the requirements of the 1980 federal PSD regulations. *See id.* ¶¶ 36, 48-58.

## II. PROCEDURAL BACKGROUND

In March 2014, almost two years before the complaint in this case was filed, the EPA issued a Notice of Violation to Blue Lake. Dkt. No. 1 ¶ 8. On February 26, 2016, the United States (acting at the request of the Administrator of the EPA) and the District together filed the operative complaint against Blue Lake. *Id.* The United States simultaneously lodged with the Court a proposed consent decree that would resolve the litigation. Dkt. No. 2. The proposed decree was subject to a 30-day public comment period before it could be approved and entered. *Id.*; *see also* 28 C.F.R. § 50.7(b).

On August 3, 2016, the Blue Lake Rancheria Tribe filed a motion to intervene in this case, explaining that the "Facility is located less than a half mile from the Tribe's trust lands, and has caused significant health, property, and safety impacts to the Tribe and its members for nearly three decades." Dkt. No. 17 at 2. The Court granted intervention limited to CAA claims that paralleled the government complaint. Dkt. No. 51. Since then, the Tribe has actively sought discovery from the other parties and has otherwise been heavily involved in this case.

The pending motion by the United States is to enter a proposed consent decree that was revised "[i]n response to the comments on the original consent decree and new information received post-lodging." Dkt. No. 46 at 3. The United States received 26 public comments, and it has prepared and filed detailed responses to those comments. *Id.* at 2; Exhs. 3 & 4. The Tribe, which was itself an active commenter on the original draft of the consent decree, opposes entry of the proposed decree. Dkt. No. 76. In addition to the United States, Blue Lake and the District also filed reply briefs in support of entry, addressing the Tribe's arguments in opposition. Dkt. Nos. 83, 86, 90. The Court has carefully reviewed the voluminous filings by all parties, and this order follows a motion hearing at which the Court discussed the proposed decree at length with the United States, the District, Blue Lake and the Tribe. Dkt. No. 105.

## III. THE PROPOSED CONSENT DECREE

The key terms of the consent decree are as follows.

**A.    COMPLIANCE REQUIREMENTS AND PERMITS**

The proposed consent decree is a 40-page document, 11 of which are devoted to "compliance requirements." Dkt. No. 46-1. The requirements impose measures to reduce the Facility's emissions of the pollutants $NO_x$ (oxides of nitrogen), CO (carbon monoxide) and $PM_{10}$ (particulates of less than 10 microns in diameter).

To minimize emissions of $NO_x$ and CO, Blue Lake must purchase and install new pollution control equipment for its boiler, namely, a Selective Non-Catalytic Reduction ("SNCR") system and an improved, forced over-fire air ("OFA") system. Dkt. No. 46-1 ¶¶ 14-15. These installations require retrofitting of the boiler, so Blue Lake must first complete a boiler engineering study in accordance with protocol approved by the EPA and the District. *Id.* ¶¶ 12-13. Once installed, the OFA and SNCR systems must be operated at all times when the boiler is in operation. *Id*. ¶ 15.

To address $PM_{10}$, Blue Lake must repair and operate its electrostatic precipitator (ESP) -- technology used to control particulate matter emissions from the boiler -- according to an approved, comprehensive optimization plan. *Id*. ¶ 16. The timeline to fix the ESP was expedited in response to public comments, and Blue Lake is now required to repair the damaged ESP plates and train its employees on proper ESP operation procedures prior to restart. *Id*. Within 14 days of restart, a consultant is to conduct a full technical evaluation of the ESP, and by 60 days after restart, Blue Lake is to submit for the EPA and the District's review and approval an ESP optimization plan to ensure $PM_{10}$ emission reductions at all times. *Id*.

The decree also sets these maximum emission rates for $NO_x$, CO, and $PM_{10}$:

|  | Maximum Emission Rate for Periods Other Than Startup or Shutdown | Maximum Emission Rate for Periods of Startup or Shutdown |
|---|---|---|
| $NO_x$ | 0.12 lb/MMBtu (24-hour Rolling Average) & 0.10 lb/MMBtu (annual Rolling Average) | 0.15 lb/MMBtu (24-hour Block Average) |
| CO | 0.40 lb/MMBtu (24-hour Rolling Average) | 0.50 lb/MMBtu (24-hour Block Average) |
| $PM_{10}$ | 0.02 lb/MMBtu (3-hour average) | 0.02 lb/MMBtu (3-hour average) |

These emission rates must be achieved no later than 12 months after the EPA's approval of the boiler engineering study report. *Id*. ¶¶ 18-19. Those 12 months are referred to as the

5

"demonstration period," and Blue Lake may, during the 6 months after the demonstration period, petition the EPA and the District to change the maximum emission rates based on proof that achievement of those rates is "technically infeasible." *Id*. ¶¶ 20-21. There are, however, limitations on how high the proposed alternative rates from Blue Lake may go, and the EPA, in consultation with the District, can deny any of Blue Lake's requests, approve the propose alternative rates (within the limits set out in the decree), or set a different emission rate (again within the "backstop" limits). *Id*. ¶¶ 21-22. Any approval by the EPA of an alternative emission rate is to be publicly reported to the Court. *Id*. ¶ 24.

The decree also contains measures to address any fugitive dust that may escape from the Facility. Blue Lake must obtain approval from the EPA and the District of a fuel management plan that includes "measures for adequate drying of the fuel while minimizing fugitive dust from fuel handling sufficient to ensure that no visible dust leaves the Facility." *Id*. ¶ 25. Similarly, Blue Lake must obtain approval of a fugitive road dust plan that includes at a minimum procedures for applying water or some other kind of dust suppressant to the unpaved roads at the Facility, and procedures and a schedule for sweeping and maintaining the paved roads at the Facility. *Id*. ¶ 26. Ash must be transported in wet condition in covered containers, or stored in closed containers at all times. *Id.* ¶ 27.

The consent decree is not itself a permit. *Id*. ¶ 90. If a compliance obligation requires Blue Lake to obtain a federal, state or local permit or approval, Blue Lake must apply for and take all other actions necessary to obtain such permits and approvals. *Id*. ¶ 76. Also, within 30 months of the EPA's approval of the boiler engineering study report, Blue Lake must "submit an application to the District to permanently include the requirements and limitations enumerated in this Consent Decree into a federally-enforceable permit (other than a Title V operating permit)," so that the requirements such as the emission rates, continuous operation requirements, and the requirements of any plan approved under the consent decree can survive the termination of the decree. *Id.* ¶ 78. Within 90 days of obtaining that permit, Blue Lake must apply to amend its Title V permit to incorporate the requirements and limitations of the new permit into the Title V permit for the Facility. *Id*. ¶ 79.

1    Blue Lake may request to terminate the decree after it has completed all compliance
2  requirements and maintained 4 years of continuous satisfactory compliance; obtained all federally-
3  enforceable permits as required; and paid the civil penalty and any accrued interest and stipulated
4  penalties mandated by the decree. *Id*. ¶ 99.  If the United States and the District agree the decree
5  should be terminated, the parties will submit a joint stipulation for termination to the Court. *Id*.
6  ¶ 101.

### B.   CIVIL PENALTY AND MITIGATION MEASURES

The decree requires Blue Lake to pay a $5,000 civil penalty, with equal halves going to the United States and the District. *Id.* ¶ 8.  The decree notes that "the United States reviewed Financial Information and determined Blue Lake has a limited ability to pay a civil penalty in this matter." *Id*. at 1.

Blue Lake must also give $10,000 to the District's Wood Stove Incentive Replacement Program as an environmental mitigation measure. *Id*. ¶ 41.  The District is to make "good faith efforts" to use this money to replace older wood stoves with more fuel-efficient heating devices within a two-mile radius of the Facility. *Id.*

### C.   REPORTING REQUIREMENTS AND STIPULATED PENALTIES

The decree imposes on Blue Lake a number of self-reporting requirements including the submission of semi-annual reports to the EPA and the District, and requirements that Blue Lake self-notify the United States and the District in the event of any violations of the consent decree. *Id*. ¶ 43.  If the violation poses an immediate threat to the public health or welfare or the environment, notification must be given within 24 hours.  *Id*. ¶ 44.  The decree additionally sets out a schedule of stipulated penalties depending on the type of violation, ranging from $250 per violation per day to $1,500 per violation per day. *Id*. ¶¶ 49-61.

**DISCUSSION**

## I.   LEGAL STANDARD

The standard for reviewing a proposed consent decree is well settled.  The Court must be satisfied that the proposed decree is "at least fundamentally fair, adequate and reasonable." *United States v. Oregon*, 913 F.2d 576, 580-81 (9th Cir. 1990).  Although the consent decree "must

conform to applicable laws," it "need not impose all the obligations authorized by law." *Id*. The Court's approval is "nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice,'" and the Court "need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" *Id*. Deference to a federal "government agency charged with protecting the public interest," such as the EPA here, is appropriate, although the Court must "eschew any rubber stamp approval" of the proposed consent decree. *United States v. Montrose Chemical Corp. of Cal.*, 50 F.3d 741, 746-47 (9th Cir. 1995); *see also Arizona v. City of Tuscon*, 761 F.3d 1005, 1013 (9th Cir. 2014) ("considerable weight is accorded to a federal executive department's construction of a statutory scheme it is entrusted to administer") (internal alterations and quotations omitted). The Court is also mindful of the general judicial policy in favor of settlements. *See*, *e.g.*, *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 939 (9th Cir. 2007) (noting "'strong judicial policy that favors settlements' of disputes in general"); *see also Montrose Chemical*, 50 F.3d at 746 (noting, in context of consent decree approval, "CERCLA's policy of encouraging early settlements").

The Court has a duty to ensure that the proposed consent decree is "both (1) the product of a procedurally fair process, and (2) substantively fair to the parties in light of a reasonable reading of the facts." *Montrose Chemical*, 50 F.3d at 746. If the decree was the product of "good faith, arms-length negotiations" which were not collusive, it is "presumptively valid and the objecting party has a heavy burden of demonstrating the decree is unreasonable." *Oregon*, 913 F.2d at 581 (internal quotations omitted).

## II. PROCEDURAL FAIRNESS

The Tribe questions the procedural fairness of the proposed consent decree primarily on grounds of alleged bias. For the District, the Tribe criticizes the "dual representation of the District's lawyer with the City of Blue Lake (who receives substantial rent payments from [Blue Lake Power])." Dkt. No. 76 at 6. This issue was raised in some of the public comments as well. *See* Dkt. No. 46-4 at 5 ("Several commenters, including the Tribe, . . . alleged that counsel for the District had a conflict of interest in the matter because she is also City Attorney for the City of Blue Lake, which receives rent from Blue Lake Power."). But the attorney, Nancy Diamond, has

8

submitted a declaration that takes the punch out of this issue. She acknowledges that she has been the general counsel to the District since 2003 and has served as the city attorney for the City of Blue Lake since 2008. Dkt. No. 46-9 (Diamond Decl.) ¶¶ 1, 4. Diamond explains why she does not believe these representations create even a potential conflict of interest: the subject matter of this litigation is enforcement of Clean Air Act permitting programs. This is statutorily within the mandate of the District, but the City has no enforcement authority in this area. *Id*. ¶¶ 6-7. Diamond notes that commenters have called out the penalty issue as particularly problematic, but she states that while the penalty provisions in the consent decree were agreed to by the District, the City of Blue Lake has taken no position one way or another. *Id*. ¶¶ 8-9. Significantly, Diamond also states in a reply declaration that "[t]he District did not participate in the calculation of the civil penalty." Dkt. No. 83-2 ¶ 3. Diamond declares that she informed both the Governing Board of the District and the City Council for the City of Blue Lake about the conflict of interest allegations and "gave them each an opportunity to review whether to retain independent counsel or waive any potential conflict of interest." Dkt. No. 46-9 ¶ 10. In response, the District provided Diamond with an informed written consent for continued representation, waiving any potential conflict, while the City of Blue Lake chose to retain outside counsel for all matters pertaining to Blue Lake as of April 2016. *Id.* ¶¶ 10-12. Taken collectively, the Court finds that these responses from Diamond amply rebut the Tribe's allegation of bias.

The Tribe alleges bias on the part of the United States from a "significant investment of stimulus money" in the Facility. Dkt. No. 76 at 6; *see also id.* at 2 (noting "at least $7,385,267" received from the United States under "the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, codified at 26 U.S.C. § 1 et seq. (2009) (also commonly known as 'the Recovery Act' or 'the Stimulus').")). At the hearing, the Tribe referred to "millions of dollars invested in the plant through credits and offsets by the United States" in the 2008 to 2010 time period. Dkt. No. 105 at 24:23-25:10. The Tribe did not dispute, however, that these tax credits were equally available to every other eligible power company in the United States, nor did it show how, if at all, these tax credits had any influence on the United States' views or actions in this case. *Id*. at 27:7-28:3. For its part, the United States confirmed that there is no policy of preferential treatment for

companies that are the recipients of federal tax credits or other monies. *Id*. at 34:9-13. This argument of bias, too, is unpersuasive.

Apart from bias, the Tribe also says that it "was never included" in the United States' discussions with Blue Lake. Dkt. No. 76 at 3. But the Tribe acknowledges that it has had multiple meetings with the United States in which it had the opportunity to voice its concerns. *See* Dkt. No. 105 at 37:23-38:1 (Tribe had pre-suit meeting with the United States); Dkt. No. 76 at 3-4 (Tribe "objected to the proposed consent decree . . . in meetings with the United States."); *see also* Dkt. No. 46 at 11 (United States' account of its "significant outreach to," and meetings with, the Tribe). The Tribe has not pointed to any legal obligation on the United States' part to do more than it already has done. *See*, *e.g.*, Dkt. No. 105 at 37:12-15 (acknowledging CAA does not impose requirement on United States to provide a copy of the consent decree to the Tribe before lodging). Its complaints about exclusion from the negotiations themselves also do not call into question the procedural fairness of the proposed decree. *See*, *e.g.*, *United States v. District of Columbia*, 933 F. Supp. 42, 49 (D.D.C. 1996) ("Nor does the mere fact that Virginia was not included in the negotiations when it was not a party prove that the Agreement is itself unfair. Both the EPA and DOJ met with representatives from Virginia to discuss its concerns. Most important, before Virginia can establish unfairness arising out of its exclusion from negotiations, it must establish its entitlement to attend such meetings. That has simply not been done."). As the United States has pointed out, the fact that it has an ongoing trust relationship with the Tribe does not change this landscape in any way. *See* Dkt. No. 46 at 11 & n.9.

Turning to the factual record of the decree negotiations process, the Court is satisfied that the agreement here was "not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Oregon*, 913 F.2d at 586 (internal quotations omitted). The United States has submitted the declaration of Mark Sims, its lead environmental engineer on this case, which describes the settlement process. Dkt. No. 46-5. The negotiations began in October 2014, and between then and late January 2016, the parties met at least nine times. *Id*. ¶ 14. The EPA, through Sims, conducted its own investigation for close to a year before issuing the Finding and Notice of Violation to Blue Lake. *Id*. ¶ 6. Sims, an experienced engineer with decades of

10

experience, requested and reviewed responsive information from Blue Lake and the District; personally walked the perimeter of the Facility; and was directly involved in the negotiations of the consent decree. *Id*. ¶¶ 1-16.  On Blue Lake's side of the table, it was represented at many of the meetings by an experienced engineer with expertise in Clean Air Act pollution controls. *Id*. ¶ 14.  A member of Blue Lake Power, LLC has submitted a declaration stating that the "EPA rejected BLP's proposed settlements several times." Dkt. No. 93-1 ¶ 9.  The United States' counsel stated at the hearing that multiple drafts of the consent decree were exchanged, and there were "at least three or four times" when it looked like the negotiations might fall apart. Dkt. No. 105 at 6:24-7:3.  Further contentious discussions were had, and changes to the consent decree were made, after the receipt of public comments. *Id*. at 7:21-10:7.  On the basis of these uncontested facts, the Court is satisfied that the proposed decree was "the product of good faith, arms-length negotiations," and it is consequently "presumptively valid." *Oregon*, 913 F.2d at 581.

## III. SUBSTANTIVE FAIRNESS

On this prong, the Tribe has failed to meet its heavy burden of demonstrating that the decree is unreasonable, and the proposed decree is instead substantively fair, representing a reasonable factual and legal determination. *Oregon*, 913 F.2d at 581.  This discussion is organized by the main objections raised by the Tribe: "the emissions limits, the timing, and the penalties." Dkt. No. 105 at 41:6-7.

### A. EMISSIONS LIMITS

The Tribe objects to the $NO_x$, CO, and $PM_{10}$ emissions limits set by the consent decree and attacks them in a few different ways.  A primary criticism is that a site-specific BACT analysis has not been done here.  *See*, *e.g.*, Dkt. No. 105 at 42:8-43:17.  As discussed, a "Best Available Control Technology" or BACT analysis for each pollutant at issue would have been required -- and Blue Lake would have had to "install BACT at the Facility" -- had Blue Lake applied for a permit for the work it performed in 2008 to 2010 prior to restarting the Facility. Dkt. No. 1 ¶¶ 86-89.  The complaint alleges that Blue Lake was legally required to do these things.

To the extent the Tribe suggests that the lack of a site-specific BACT analysis leaves the Court without the kind of "benchmark with which to compare" the consent decree as required by

11

1   *Montrose Chemical*, 50 F.3d at 746, the argument is not well taken.  The United States has taken

2   pains to compare in detail the emissions limits required by the consent decree with those at other,

3   comparable biomass facilities that have undergone BACT determinations.  That is an acceptable

4   way to proceed.

5         The comparison here between the pollution reduction that would be achieved under the

6   consent decree versus that under a "BACT-equivalent" analysis supports the reasonableness of the

7   emissions limits in the decree.  EPA engineer Sims attached to his declaration a "Statement of

8   Basis" which includes a BACT determination for SPI Anderson, a new 31 MW biomass facility in

9   Shasta County.  Dkt. No. 46-5 ¶ 30.  While Sims acknowledges that "each BACT determination is

10  source specific," he believes that "the SPI Anderson BACT determination is informative regarding

11  pollution control technology at biomass facilities."  *Id*.  Comparing the emissions limits in the

12  proposed decree with the BACT determination for SPI Anderson shows that for NOx, the limits in

13  the decree (0.10 lb/MMBtu generally and 0.125 lb/MMBtu as a backstop) are more stringent than

14  that determined to be BACT for SPI Anderson (0.13 lb/MMBtu).  *Compare* Dkt. No. 46-1 ¶¶ 18,

15  21 *with* Dkt. No. 46-5, Exh. 1 at 15.  For $PM_{10}$, the limit in the proposed consent decree is

16  identical to that in the SPI Anderson BACT determination (0.02 lb/MMBtu), although the consent

17  decree's 0.03 lb/MMBtu backstop limit is higher.  *Compare* Dkt. No. 46-1 ¶¶ 18, 21, *with* Dkt.

18  No. 46-1, Exh. 1 at 21.  The CO emissions limits proposed by the consent decree are slightly

19  higher than that determined to be BACT for SPI Anderson and other similar units, but do not

20  appear to be wildly outside the general range.  *Compare* Dkt. No. 46-1 ¶¶ 18, 21, *with* Dkt.

21  No. 46-5, Exh. 1 at 18.  Overall, the evidence in the record supports engineer Sims' conclusion

22  that "the emission rates and control technology required by the decree are comparable to or more

23  stringent than those for similarly-situated facilities that have gone through a full analysis of

24  BACT."  Dkt. No. 46-5 ¶ 32.  A few less favorable comparisons on specific points do not require

25  rejection of the entire decree.

26        To the extent the Tribe objects to the lack of a site-specific BACT analysis in and of itself,

27  that too is not a good objection.  *See*, *e.g.*, Dkt. No. 105 at 42:8-10 ("When they put $6 million

28  into this plant and took it from zero emissions to multiple tons of emissions per year in a narrow

12

river valley, they didn't go through the top-down BACT analysis."). While the complaint is premised upon Blue Lake's failure to apply for a permit and do a BACT analysis, plaintiffs had no obligation or entitlement to demand that each and every allegation be strictly satisfied through a consent decree. After all, a consent decree is "essentially a settlement agreement" and "is the product of negotiation and compromise." *Oregon*, 913 F.2d at 580. The Tribe might think that this was an "open-and-shut PSD case." Dkt. No. 105 at 54:1-3; *see also* Dkt. No. 46-4 at 17 ("The Tribe also indicated its preference that the United States litigate this case."). But the Unites States has identified material and reasonable litigation risks that the Tribe completely ignores. *See*, *e.g.*, Dkt. No. 46 at 12 (noting that the United States has received adverse rulings in other similar cases and could be subject here to defenses including that the 2008 to 2010 work was not a "modification"); Dkt. No. 90 at 6 (additional litigation risk created by fact of "the District's 2008 communication to [Blue Lake] that it could restart under its existing permit").

The Tribe also argues that the proposed emissions limits in the decree should not be accepted because they "will likely prevent Humboldt County from achieving attainment with the CAAQS [California ambient air quality standards] for $PM_{10}$ and could push the County into nonattainment with the NAAQS [national ambient air quality standards] for both $PM_{10}$ and $NO_x$." Dkt. No. 76 at 9. But the Tribe's argument is based on unnecessary conjecture. Nothing in the consent decree gives Blue Lake permission to violate any state or national air quality standards. Rather, the consent decree expressly states that it is not a permit, and makes clear that Blue Lake must in fact apply for and obtain all necessary permits and must later apply for a federally-enforceable permit that will incorporate all of Blue Lake's obligations under the decree. Dkt. No. 46-1 ¶¶ 77-81. Whether or not the Facility is in compliance with CAAQS and NAAQS will properly be addressed in those permitting processes and need not and should not be addressed in the hypothetical here. The District confirmed at the hearing that in those downstream permitting processes, it will not be able to "issue permits if they violate those [ambient air quality] standards, and the district cannot issue any permits that are not protective of the public health." Dkt. No. 105 at 18:17-19.

**B. TIMELINE**

The Tribe complains that the earliest that Blue Lake "could be held accountable" for violating the emissions limits in the proposed consent decree is 2018, and this makes for an "unreasonably protracted schedule" that is not fair. Dkt. No. 76 at 15. The Tribe argues that this will allow violations to continue without consequence in the meantime, to the detriment of the community. The United States has, however, acknowledged this concern and prevailed on revising the decree to expedite certain deadlines. *See* Dkt. No. 46-4 at 8; *see also* Dkt. No. 105 at 9:13-18. Also, the consent decree gives Blue Lake a lot to do, and it is not unreasonable to give Blue Lake time -- a relatively short 18 months -- to get that work done. *See United States v. Wisconsin Elec. Power Co.*, 522 F. Supp. 2d 1107, 1120 (E.D. Wis. 2007) ("[P]hasing is necessary because installing the controls takes time."). And there can be no question that the emissions reductions will be realized much sooner under the consent decree than they would have been under the alternative scenario of protracted litigation. The timeline provided by the proposed decree does not make it substantively unfair.

**C. PENALTY AND SELF-REPORTING**

The Tribe makes a slew of different arguments against the $5,000 civil penalty imposed by the consent decree. None of them help the Tribe meet its heavy burden.

Initially, the Tribe argued that the Court could not approve the penalty because of the lack of factual support offered by the United States. Dkt. No. 76 at 19. The Tribe more specifically took issue with the fact that the United States' claim that Blue Lake has a severely limited ability to pay "rests wholly on the Declaration of Mark Sims, an EPA chemical engineer." *Id*. at 20. The United States has remedied this issue on reply, offering the declaration of economist Gail Coad. Dkt. No. 90-1. Coad initially studied Blue Lake's ability to pay in September to December of 2014, after Blue Lake first made a claim that it could not pay any penalty. *Id*. ¶ 5; *see also* Dkt. No. 46-5 (Sims Decl.) ¶ 17. Coad explains that among other things, she reviewed three years of federal income tax return data, most recently from December 31, 2013, and found that the company was "not profitable in any of those three years and had [a] substantial negative cash flow

14

from operations." Dkt. No. 90-1 (Coad Decl.) ¶ 6. Further, the company was "technically insolvent (current assets less than current liabilities) in 2012 and 2013." *Id*.

Coad states that she performed an updating review in July 2016, after the conclusion of the comment period for the original consent decree. *Id*. ¶ 9. She reviewed Blue Lake's two-year pro forma cash flow statement showing how it intended to meet all of its obligations under the consent decree, and also prepared two rounds of questions that Blue Lake responded to. *Id*. Coad's update confirmed that while Blue Lake had the potential to operate profitably, there was also a risk that it could not. In particular, the relatively low price of electricity in 2015 and 2016 compared to prior years showed that Blue Lake's pro forma analysis was optimistic. *Id*. ¶¶ 9-13. Coad's analysis consequently again confirmed that Blue Lake had no ability to pay a penalty beyond a nominal one. Given that Coad's declaration was newly offered on reply, the Court gave the Tribe an opportunity to file a supplemental opposition. Significantly, that brief no longer alleges a lack of evidence on the issue of Blue Lake's ability to pay. Dkt. No. 103. The objection, which would have been overruled anyway, is deemed to have been withdrawn by the Tribe.

Another of the Tribe's arguments is that the $5,000 penalty is too small compared to two cases against other biomass facilities that were resolved by consent decree six years ago. Dkt. No. 76 at 24. The United States persuasively points out in response, however, that that is not an apples-to-apples comparison. Penalty determinations are necessarily unique to each case. The statutory factors that must be considered are the "size of the business, the economic impact of the penalty on the business, the violator's full compliance history, and good faith efforts to comply, the duration of the violation as established by credible evidence, payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance and the seriousness of the violation." 42 U.S.C. § 7413(e)(1). These criteria are not assigned any particular weight. *See Wisconsin Elec. Power*, 522 F. Supp. 2d at 1120. Moreover, the $5,000 civil penalty is not so small when considered together with the additional sums of money Blue Lake will have to spend on the injunctive relief portions of the decree. The Unites States estimates that amount to be $800,000, Dkt. No. 46-5 (Sims Decl.) ¶ 18, and Blue Lake has provided a more detailed estimate that brings the total to more than $1.4 million. *See* Dkt. No. 93-1 (Zane Decl.)

¶ 4. The Tribe asserts, without any case law citations, that these amounts cannot be a part of the Court's overall analysis, Dkt. No. 103 at 5, but the Court rejects that position. *See*, *e.g.*, *Pacific Gas & Elec.*, 776 F. Supp. 2d at 1028 (approving United States' judgment "that its settlement leverage would be better spent securing PG&E's agreement to perform a costly mitigation project that would directly benefit the public and environment affected by the plant than demanding a higher civil penalty that, if obtained, would be deposited in to the United States Treasury.").

The Tribe also objects to the fact that the United States has not laid out in detail what its penalty calculation would have been had the United States prevailed at trial. The Tribe says that there is consequently no "benchmark" amount to compare the $5,000 penalty to. *See* Dkt. No. 1 (citing *Montrose Chemical*, 50 F.3d at 747). This misunderstands the controlling case law. While *Montrose Chemical* held that the Court should have "some benchmark with which to compare" a proposed consent decree, *id*. at 746, it did not require that the government take on the laborious project of mapping out every last inch of what a total litigation victory would have looked like. This is especially true for something as inherently complex as a multi-factor penalty calculation.

What *Montrose Chemical* does say is that the Court should factor into its consent decree approval analysis "any reasonable discounts for litigation risks, time savings, and the like that may be justified." 50 F.3d at 747 (internal quotations omitted). This the Tribe completely ignores. As noted, there is a real litigation risk here that plaintiffs face and would have had to surmount had they decided to litigate rather than settle. The record suggests that the District may well have contributed to some "confusion" about whether Blue Lake could restart their Facility after the work in 2008 to 2010 without going through additional permitting, and so "the need to send a deterrent message in such situations through a significant civil penalty is diminished." *Pacific Gas & Elec.*, 776 F. Supp. 2d at 1028. Blue Lake's other possible defenses, such as that the work done here does not count as a "modification" under the CAA at all, add to the litigation risk. And as the Court has also noted above, there is very obviously a significant time savings that will be achieved by the consent decree as compared to a victory that could only have been won after a lengthy battle in court. Taking all of these considerations together, the Court concludes that the

Tribe's objections to the $5,000 civil penalty do not make the consent decree unreasonable or substantively unfair.

Similarly, the proposed decree's self-reporting and testing mechanisms are unproblematic. It is common for environmental regulators to rely on self-measurements, even when other mechanisms are available. The Court recognizes that the Tribe has proposed alternative systems and is frustrated that there is only one annual stack test, and no specific monitoring during start-up and shut-down periods. Dkt. No. 76 at 16-19. But the United States considered these comments in detail and responded by adopting some of the Tribe's suggestions, including moving up the required stack test so that it must be conducted earlier after the restart of the Facility. Dkt. No. 105 at 8:12-17; Dkt. No. 46-4 at 12-13. The revised decree represents the result of compromise and the Court finds that the proposed monitoring parameters are not unreasonable.

In sum, there can be no doubt that the proposed amended consent decree will reduce harmful emissions from the Facility, furthering a primary purpose of the CAA to protect and enhance the quality of the nation's air. 42 U.S.C. § 7401(b)(1). The United States estimates that there will be reductions of 226 to 301 tons per year ("tpy") of CO, 13 to 25 tpy of NOx, and 5 to 10 tpy of $PM_{10}$, reflecting the permissible range of emissions limits in the decree. Dkt. No. 46-5 (Sims Decl.) ¶ 29. The decree secures these public benefits much sooner than litigation ever would have, and the benefits will be long-lasting, as the decree requires Blue Lake to incorporate these emissions limits and schedules into a federally-enforceable permit such that the obligations will survive the termination of the decree. The decree will directly lead to significant improvements in the air quality in the immediate vicinity of the Facility, including tribal lands, by requiring that Blue Lake materially improve its fuel management and fugitive dust controls.

## CONCLUSION

The proposed decree is fair, adequate and reasonable, and is approved. The United States' motion is granted, and the decree will be entered and effective on the date of this order.

**IT IS SO ORDERED.**

Dated: February 23, 2017

_____
JAMES DONATO
United States District Judge